UNITED STATES of America, Appellee,

v.

Noble Adjin LARTEY, Appellant.

No. 974, Docket 82–1374.

United States Court of Appeals, Second Circuit.

Argued March 8, 1983.

Decided Aug. 22, 1983.

Simeon Golar, New York City (Peter R. Silverman, New York City, of counsel), for appellant.

Philip Le B. Douglas, Asst. U.S. Atty., S.D.N.Y., New York City (John S. Martin, Jr., U.S. Atty., S.D.N.Y., Gerard E. Lynch, Asst. U.S. Atty., New York City, of counsel), for appellee.

Before KAUFMAN and KEARSE, Circuit Judges, and MacMAHON, District Judge.[*]

MacMAHON, District Judge.

Noble Adjin Lartey, a licensed pharmacist, appeals from a judgment of conviction on a six-count indictment entered in the United States District Court for the Southern District of New York after a jury trial before Edmund L. Palmieri, *Judge.*

Count 1 charged Lartey with conspiracy to distribute and dispense, and possess with intent to distribute and dispense, approximately 751,400 Gluthethimide ("Doriden") tablets and 695,000 Empirin with Codeine No. 4 ("Empirin") tablets, in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(B) & 846 (1976). Counts 2, 3 and 4 charged him with distributing, and possessing with intent to distribute, large quantities of Doriden and Empirin in 1980, 1981 and 1982, respectively, in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(B) (1976) and 18 U.S.C. § 2 (1976). Counts 5 and 6 charged him with falsifying records required to be made and kept by pharmacists, in violation of 21 U.S.C. § 843(a)(4)(A) (1976), specifically, by keeping forged prescriptions for Doriden and Empirin (Count 5) and by making false reports that these drugs had been stolen (Count 6).

[*] Of the United States District Court for the Southern District of New York, sitting by designation.

Lartey was sentenced to five years' imprisonment and a twenty-year special parole term on Counts 2 through 4, with the prison sentences to run consecutively. He was sentenced to five years' imprisonment, to be followed by five years' unsupervised probation, on Count 1, and four years' imprisonment on each of Counts 5 and 6. The prison sentences on Counts 1, 5 and 6 are to run concurrently with each other and with the sentences imposed on Counts 2 through 4. In addition, Lartey was fined $15,000 on each of Counts 1 through 4 and $30,000 on each of Counts 5 and 6.

Lartey asserts several grounds for reversal. He argues that the government abused the grand jury process, in violation of his Fourth Amendment rights. He contends as to Count 6 that his acts did not violate the applicable statute and that the theft report forms upon which his conviction was based were obtained by an unlawful search. In addition, he claims that Counts 2 through 4, charging illegal distribution of Doriden and Empirin, were multiplicious. Finally, he argues as to all counts that Judge Palmieri's charge to the jury was "palpably biased in favor of the government."

We affirm the judgment of conviction except as to Count 6, which we reverse and remand for further proceedings respecting the validity of the search of Lartey's briefcase.

## BACKGROUND

There was evidence from which the jury could have found the following facts:

Doriden and Empirin, when taken together, are highly addictive and extremely dangerous. They induce a potent "high" and are used by addicts as an inexpensive substitute for heroin. In March 1982, a drug wholesaler, aware of the common abuse of these drugs, noticed that Lartey, a new customer, was ordering suspiciously large quantities of Doriden and Empirin for three

pharmacies owned and controlled by him—Grand General and Ascot pharmacies in The Bronx, and Hillside Pharmacy in Manhattan.[1] The wholesaler, after telling Lartey of his intentions, informed the Drug Enforcement Administration ("DEA") of Lartey's excessive purchases.

The DEA commenced an audit of the pharmacies' records, starting with Grand General. Wholesale invoices were compared with prescription files. The results were startling. Lartey's pharmacies had received over 750,000 Doriden tablets and 695,000 Empirin tablets from March 1980 through March 1982. Over one million tablets were missing, for only 20% of the tablets received could be accounted for by prescription, and, even then, 95% of the prescriptions were written by a single physician, James E. Wesley.[2] A prescription for Doriden was usually paired with one for an equal quantity of Empirin. Many prescriptions omitted information required by law, and some lacked the signature of the filling pharmacist; others were filed out of chronological sequence; and still others lacked the signature of the physician or had obviously been altered or forged. The inference of substantial drug trafficking compelled by this array was corroborated by unexplained expenditures and cash deposits from undisclosed sources.

Lartey obstructed the investigation from the outset. At a meeting with DEA investigators on March 24, 1982, he claimed that he had transferred Doriden and Empirin from Hillside and Ascot to Grand General, but said he was unable to produce underlying records. Two days later, however, Lartey produced records, purporting to be those of Hillside and Ascot, documenting transfers of Doriden and Empirin tablets to Grand General. These records were obviously and crudely falsified, and, even then, accounted for only a fraction of the missing tablets. The falsity of the records was fur-

1. Grand General and Hillside pharmacies were owned by Nadlar Drugs, Inc., of which Lartey was the sole shareholder. Ascot Pharmacy was owned by Uptown Drugs, Inc., which was also controlled by Lartey.

2. Subsequent to Lartey's conviction, Dr. Wesley was indicted on narcotics trafficking charges for selling sham prescriptions. Dr. Wesley pled guilty and is awaiting sentencing.

ther established by two employees who worked at Grand General.

During his initial interview, Lartey attempted to explain the missing tablets by claiming that two burglaries had occurred at Grand General. Yet, he admitted that he had failed to report the burglaries as required by state and federal law. Similarly, on March 29, 1982, Lartey told an investigator that Grand General had been burglarized once again on the prior evening.

The evidence gathered at this preliminary stage of the investigation of one of the three pharmacies—Grand General—thus revealed that Lartey was distributing tens of thousands of highly-addictive and dangerous tablets every month and had to be stopped immediately. It was also learned that there was a danger of flight, for Lartey was a citizen of Ghana, had children and other family there, travelled extensively, and had acquired a fortune, apparently from drug dealing. Moreover, he was attempting to cover up his unlawful drug business by falsifying records, claiming and even staging sham burglaries, and destroying evidence. It was reasonably clear also that the investigation of the other two pharmacies—Hillside and Ascot—would be met with a similar pattern of obstruction and that Lartey might fabricate a defense by shifting records among his three pharmacies.

Confronted with these exigent circumstances, in April 1982, the government decided not to undertake a lengthy grand jury investigation but to arrest Lartey immediately. Accordingly, on April 15, 1982, a complaint was filed charging Lartey with conspiracy to violate the narcotics laws; a warrant for his arrest was obtained; and two forthwith grand jury subpoenas duces tecum, returnable at 4:00 P.M. that day, were issued directed to the custodians of records at the Hillside and Ascot pharmacies. These subpoenas called for "prescription files, inventories, prescription log books, reports of thefts," and other records concerning the receipt and distribution of controlled substances by Lartey's pharmacies. Typical of subpoenas duces tecum is-

sued in the Southern District of New York, they bore the following legend:

> "*Please note.* Delivery of the information identified above to any agent or investigator of the Drug Enforcement Administration for transmission to the Grand Jury will be deemed adequate compliance with the subpoena."

Lartey was expected to be at Grand General at 2:00 P.M., but in order to give the pharmacists time to gather the records and yet deny Lartey an opportunity to tamper with them, the agents were directed not to serve the subpoenas before 2:00 P.M., but to wait until after Lartey's anticipated 2:00 P.M. arrest. The plan, however, went awry. Lartey did not appear at Grand General until shortly before 4:00 P.M. He was arrested immediately. Shortly thereafter, the subpoenas were served on the supervising pharmacists at the Ascot and Hillside pharmacies.

The agents were unarmed, and no one was threatened with contempt or other penalties for failure to comply. Quite the contrary. One agent informed Marella, the supervising pharmacist at Ascot, of his options: he could turn the subpoenaed records over to the agents; bring them to the grand jury personally; or decline to turn them over at all. The premises were not searched, and the agents informed Marella that they had no power to enforce the subpoenas.

The agents granted Marella's request to telephone Lartey and advised that Lartey could be reached at Grand General. Marella tried but was unsuccessful. Marella then was allowed to telephone the pharmacy's attorney. Marella did so and then told the agents that there would be no problem, turned the records over to them, and they were transported at once to the United States Attorney's office.

The subpoena directed to Hillside Pharmacy was served upon the supervising pharmacist, Lucci, at 3:50 P.M., shortly after Lartey's arrest. Lucci attempted unsuccessfully to telephone Lartey and then asked what the consequences would be if he did not comply with the subpoena. One

agent replied that he did not know but directed Lucci's attention to the language found on all subpoenas, which states:

"And for failure to attend and produce the said documents you will be deemed guilty of contempt of court and liable to penalties of law."

Hillside was not searched. Instead, as Lucci testified, "they asked and we gave them." Only corporate records were produced, and they were taken by the agents to the United States Attorney's office.

The records from Hillside and Ascot, along with those obtained from Grand General in March 1982, were kept in the United States Attorney's office, where they were examined by a DEA investigator. Pressed by the Speedy Trial Act, the government obtained a one-count indictment, containing a bare-bones conspiracy charge, on May 11, 1982 before the grand jury had completed its investigation. The records were further analyzed and, when the government was otherwise prepared, all of Lartey's records were presented to the grand jury on July 1, 1982 resulting in the filing of the instant six-count superseding indictment.

During its investigation, the government retained a recently retired Internal Revenue Service agent, Eugene Moran, to analyze Lartey's finances. This analysis was compiled for presentation to the grand jury and to enable Moran to testify as an expert at trial. Moran reviewed signature cards, monthly statements, cancelled checks, and deposit tickets for three checking accounts that Lartey maintained.

The evidence at trial firmly established that Lartey had distributed Doriden and Empirin unlawfully for a period of two years while fully versed in the laws pertaining to controlled substances and aware of the widespread abuse of those drugs. Moreover, it is clear that he attempted to conceal this illicit activity by failing to keep required records, falsifying prescriptions, and fabricating evidence. The proof also showed that, upon becoming aware of the DEA investigation, Lartey took numerous steps to impede it, including preparing false theft report forms to account for the "missing" drugs.

Additional facts are set forth below as they relate to Lartey's claims on appeal.

## DISCUSSION

### 1. Abuse of the Grand Jury Process.

Lartey argues that the government abused the grand jury process by obtaining the pharmacies' documents pursuant to "forthwith" grand jury subpoenas duces tecum, in violation of his Fourth Amendment rights. He also contends that the government's use of Moran to analyze financial records which had been presented to the grand jury violated Rule 6(e), Fed.R. Crim.P., which mandates grand jury secrecy. We find both claims without merit.

### (a) Use of the "Forthwith" Subpoenas.

Lartey contends that the government violated his Fourth Amendment rights by serving forthwith grand jury subpoenas duces tecum immediately after his arrest. In particular, he claims that the subpoenas were "a subterfuge and a substitute" for a search warrant, which would have required a showing of probable cause and the interposition of a neutral judicial officer between the investigators and Lartey. In support of his argument that the subpoenas were vehicles for the government unlawfully to obtain evidence crucial to his case, rather than legitimate instruments of a grand jury inquiry, Lartey notes that the subpoenaed records were not presented to the grand jury until two and one-half months after they were produced. He also stresses that he was denied an opportunity to test the validity of the subpoenas because he was arrested before the subpoenas were served and before the 4:00 P.M. return time of the subpoenas. Finally, Lartey contends that the Ascot and Hillside subpoenas were served in such a coercive fashion that consent was not voluntary but compelled, resulting in a de facto search and seizure.

Lartey's claims were considered and rejected by Judge Haight, who, after conducting an evidentiary hearing, found that the

agents' reasonable, good faith belief that Lartey would fabricate or destroy pharmacy records if given the opportunity justified the issuance of the "forthwith" subpoenas. He also found that the subpoenas were served properly without "excess or overreaching on the part of the DEA agent." He also held that it was proper for the government to make the records available to Moran for extended analysis prior to presenting them to the grand jury. In sum, Judge Haight found that the government committed no impropriety.

We have never addressed the question of the validity of "forthwith" grand jury subpoenas, although district courts within this circuit have confronted the issue. See In re Nwamu, 421 F.Supp. 1361 (S.D.N.Y.1976); United States v. Re, 313 F.Supp. 442 (S.D. N.Y.1970). We begin by noting that the power of the grand jury to inquire into the existence of possible criminal conduct is firmly established, Branzburg v. Hayes, 408 U.S. 665, 688, 92 S.Ct. 2646, 2660, 33 L.Ed.2d 626 (1972), and that a key element of that power is the authority to require the production of evidence. United States v. Mandujano, 425 U.S. 564, 571, 96 S.Ct. 1768, 1774, 48 L.Ed.2d 212 (1976). Courts have long recognized that the issue of whether a subpoena impinges on Fourth Amendment rights must be determined from the facts of each particular case. Hale v. Henkel, 201 U.S. 43, 76–77, 26 S.Ct. 370, 379–80, 50 L.Ed. 652 (1906); Boyd v. United States, 116 U.S. 616, 633–35, 6 S.Ct. 524, 533–35, 29 L.Ed. 746 (1886); United States v. Guterma, 272 F.2d 344 (2d Cir.1959).

■ The instant case involves records of corporations. Although the Fourth Amendment protects corporations from subpoenas duces tecum that are unreasonably broad, Oklahoma Press Publishing Co. v. Walling, 327 U.S. 186, 208, 66 S.Ct. 494, 505, 90 L.Ed. 614 (1946), neither the officers of a corporation, Wilson v. United States, 221 U.S. 361,

376–77, 31 S.Ct. 538, 542–43, 55 L.Ed. 771 (1911), the shareholders, see Grant v. United States, 227 U.S. 74, 80, 33 S.Ct. 190, 192, 57 L.Ed. 423 (1913), the custodian of the records, Wheeler v. United States, 226 U.S. 478, 33 S.Ct. 158, 57 L.Ed. 309 (1913), nor the corporation itself, Wilson v. United States, supra, 221 U.S. at 374–75, 31 S.Ct. at 541, has any other Fourth Amendment interest in corporate records.

■ In light of the exigent circumstances shown here, we find no error in Judge Haight's finding that the government's use of forthwith grand jury subpoenas was entirely lawful. The investigators had substantial reason to believe, from their preliminary audit of Grand General Pharmacy, that Lartey was engaged unlawfully in distributing and dispensing Doriden and Empirin and that the three pharmacies were an integral part of his illicit business. The subpoenas sought records of the Ascot and Hillside pharmacies pertaining to controlled substances, the ownership of the pharmacies, and financial data for the period September 1980 through the date of the subpoenas. The materiality and reasonableness of these requests are readily apparent; records pertaining to controlled substances were required to be kept and would reveal false reports. Therefore, the subpoenas, standing alone, were entirely proper and not overly broad. Indeed, had Lartey contested the validity of the subpoenas, he would not have succeeded. There was no valid objection that could be raised to the compelled production of these corporate records.[3]

■ That the subpoenas, in effect, required the production of the pharmacies' records "forthwith," while Lartey was under arrest, does not alter our conclusion. Judge Haight found that the government was motivated by reasonable and good faith concerns that Lartey would attempt to tam-

---

**3.** The subpoenaed documents were corporate records to which no Fifth Amendment privilege applied. Wilson v. United States, 221 U.S. 361, 382, 31 S.Ct. 538, 545, 55 L.Ed. 771 (1911). Moreover, these documents were required to be "kept and be available . . . for inspection and copying by" authorized DEA officials. 21 U.S.C. § 827(b). Thus, they were also "required records" whose production cannot be resisted on Fifth Amendment grounds. Shapiro v. United States, 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948).

per with the evidence if given the opportunity. This finding of fact, reached after a lengthy evidentiary hearing, is not clearly erroneous, and we are bound by it. *See United States v. Sanchez,* 635 F.2d 47, 60 (2d Cir.1980); *United States v. Forero-Rincon,* 626 F.2d 218, 224 (2d Cir.1980). The reasonableness of the government's concern is apparent in view of Lartey's prior attempts to escape detection by preparing false and fabricated documents. Although a subpoena calling for the immediate production of documents hampers the ability of one to contest its validity before a judicial officer, we decline to rule that such subpoenas are *per se* illegal. Rather, the issuance of a "forthwith" subpoena may be justified by the facts and circumstances of a particular case. *United States v. Re, supra,* 313 F.Supp. at 448–49. In this instance, we hold that the issuance of forthwith subpoenas to be served after Lartey's arrest was justified to preserve the integrity of the evidence in light of the very real danger that Lartey would further attempt to obstruct the investigation by falsifying, fabricating, or destroying corporate records.

■ We also reject Lartey's contention that the supervising pharmacists did not comply with the subpoenas voluntarily but were coerced. The agents did not seize the records and never demanded that they be turned over to them. Rather, the agents informed the pharmacists of their options, including taking the records personally to the grand jury. Moreover, the pharmacists were allowed to communicate with attorneys and others regarding how to respond to the subpoenas. The agents made no threats, and there is no evidence that they otherwise acted aggressively or overbore the will of the pharmacists. One agent at the Hillside Pharmacy did direct the pharmacist's attention to boilerplate language on the subpoena regarding the sanction of contempt for failure to comply. The pharmacist, Lucci, testified, however, that while he did feel compelled by this language, he had not given the matter much thought and that the agents at Hillside were polite and uttered no threats. Based upon an examination of the totality of the circumstances,

*Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2047–48, 36 L.Ed.2d 854 (1973), Judge Haight concluded that the production of the pharmacies' records was not coerced but voluntary. His finding was not clearly erroneous. *United States v. Allison,* 619 F.2d 1254, 1262 (8th Cir.1980).

The case on which Lartey relies, *In re Nwamu, supra,* is clearly distinguishable, for there the agents serving the forthwith subpoenas enforced them with threats of contempt and physically removed subpoenaed items despite counsel's specific direction not to take them from the premises. Indeed, the court in *Nwamu* found that the agents had treated the subpoenas as though they were search warrants and had conducted a warrantless seizure. There is no such finding here. Nor is there a basis for one.

■ Lartey's final argument is that the delayed presentation of the pharmacies' records to the grand jury evidences an illicit purpose behind the subpoenas. The pharmacies' records were not submitted to the grand jury that returned the original indictment against Lartey. Rather, they were studied by the United States Attorney's office for a period exceeding two months and then submitted to the grand jury. There was a valid reason for this delay. The government, having arrested Lartey on a complaint, was under the pressure of the Speedy Trial Act to indict him, and the initial indictment was, as the government concedes, of the "bare bones" variety, containing only a single-count conspiracy charge. This was then superseded by a six-count indictment after large quantities of material had been analyzed and presented to the grand jury. Judge Haight found that the government's actions were proper and that it is a legitimate and common practice to analyze subpoenaed documents to ensure a coherent presentation to the grand jury. That finding is not clearly erroneous. *See Robert Hawthorne, Inc. v. Director of Internal Revenue,* 406 F.Supp. 1098, 1118 (E.D.Pa.1975). In short, there is nothing to support Lartey's claim that the

retention of the pharmacy documents by the United States Attorney's office demonstrated the government's intent to utilize the subpoena process to effect a warrantless search and seizure.

In summary, we conclude that the government did not violate the Fourth Amendment nor otherwise abuse the grand jury process by issuing the forthwith subpoenas in its investigation of Lartey.[4] In view of our disposition, we do not reach the question of whether dismissal of the indictment or suppression of the documents would be appropriate remedies for such abuse.

### (b) *Employment of Moran as a Government Expert.*

Prior to trial, the government retained Eugene Moran, a specialist in investigative accounting, as an expert consultant and witness. As noted above, Moran reviewed signature cards, monthly statements, cancelled checks and deposit tickets for three checking accounts that Lartey maintained. Moran did not review any other documents submitted to the grand jury, nor was he exposed to transcripts of testimony by grand jury witnesses.

During the period that Moran had access to Lartey's bank records, he was employed exclusively by the government. The records were kept in a secure location in the United States Attorney's office, and Moran did not discuss them with anyone other than Assistant United States Attorney Douglas and agents assisting Douglas in the investigation. A portion of Moran's analysis of the records was submitted to the grand jury that returned the superseding indictment, and Moran testified as an expert at trial. He did not otherwise participate in the grand jury's investigation of Lartey.

Lartey argues that the indictment should be dismissed because Moran's activity violated Rule 6(e), Fed.R.Crim.P., which imposes a general rule of secrecy regarding "matters occurring before the grand jury."[5] The government responds that the bank records were not "matters occurring before the grand jury" and, therefore, Moran's activity was outside the scope of Rule 6(e). The government also contends that it may disclose grand jury material while preparing witnesses for trial and that Moran falls within the "government personnel" exception to Rule 6(e).

Initially, it is difficult to see how Lartey was prejudiced, even if we assume that the government breached grand jury secrecy. In *Douglas Oil Co. v. Petrol Stops Northwest,* 441 U.S. 211, 219, 99 S.Ct. 1667, 1673, 60 L.Ed.2d 156 (1979), the Supreme Court identified the various interests served by

---

**4.** Lartey raises another issue regarding the grand jury process which is totally spurious. After the initial grand jury indictment of Lartey was filed on May 11, 1982 and during its continuing investigation of Lartey leading to the superseding indictment, the government caused the issuance of additional grand jury subpoenas on May 28. Lartey objected, and the government withdrew these subpoenas and obtained trial subpoenas pursuant to an order of Judge Haight. Lartey contends that this was an attempt by the government to use the grand jury for the illicit purpose of obtaining information in support of an already pending indictment. Since the grand jury subpoenas were withdrawn, we fail to see the relevance of this claim.

**5.** Rule 6(e) provides, in pertinent part:

"(2) General Rule of Secrecy.—A grand juror, an interpreter, a stenographer, an operator of a recording device, a typist who transcribes recorded testimony, an attorney for the government, or any person to whom disclosure is made under paragraph (3)(A)(ii) of this subdivision shall not disclose matters occurring before the grand jury, except as otherwise provided for in these rules. No obligation of secrecy may be imposed on any person except in accordance with this rule. A knowing violation of Rule 6 may be punished as a contempt of court.

(3) Exceptions.

(A) Disclosure otherwise prohibited by this rule of matters occurring before the grand jury, other than its deliberations and the vote of any grand juror, may be made to—

(i) an attorney for the government for use in the performance of such attorney's duty; and

(ii) such government personnel as are deemed necessary by an attorney for the government to assist an attorney for the government in the performance of such attorney's duty to enforce federal criminal law."

preserving grand jury secrecy. One of these interests is the prevention of harm to the reputation of those who are investigated but ultimately exonerated by the grand jury. To the extent that a target of an investigation has a tangible interest in maintaining grand jury secrecy, it is surely limited to protection of his reputation. As Judge Haight noted, "Lartey having been arrested, indicted and publicly arraigned on May 20, 1982, on the original indictment charging him with narcotics violations, a primary policy reason for grand jury secrecy no longer obtained." *See also United States v. Alper,* 156 F.2d 222, 226 (2d Cir. 1946).

It is equally unlikely that disclosure of the bank records to Moran undermined the remaining policy consideration underlying grand jury secrecy—protection of the grand jury from outside interference. This court has indicated on several occasions that documents are not cloaked with secrecy merely because they are presented to a grand jury. *See United States v. Weinstein,* 511 F.2d 622, 627 n. 5 (2d Cir.), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2655, 45 L.Ed.2d 693 (1975); *United States v. Interstate Dress Carriers, Inc.,* 280 F.2d 52, 54 (2d Cir.1960). As the Seventh Circuit noted in *United States v. Stanford,* 589 F.2d 285, 291 (7th Cir.1978), *cert. denied,* 440 U.S. 983, 99 S.Ct. 1794, 60 L.Ed.2d 244 (1979), "[u]nless information reveals something about the grand jury proceedings, secrecy is unnecessary." Here, it can hardly be supposed that the bank records that Moran reviewed yielded information regarding the scope or direction of the grand jury investigation. Nor can it reasonably be expected that Moran, a former I.R.S. agent who had passed a security clearance investigation, would pass along such information if he had it.

■ In any event, we conclude that Moran's employment falls within the "government personnel" exception to Rule 6(e), which permits disclosure of grand jury proceedings to

"[s]uch government personnel as are deemed necessary by an attorney for the government to assist an attorney for the government in the performance of such attorney's duty to enforce a federal criminal law." Fed.R.Crim.P. 6(e)(3)(A)(ii). There is nothing in the legislative history of the 1977 amendments to Rule 6(e) permitting disclosure to "government personnel" to indicate that the term is limited to permanent civil service employees of the United States. Rather, this exception to the rule of grand jury secrecy was adopted to override decisions " 'highly restrictive of the use of government experts' " in grand jury investigations. *In re Gruberg,* 453 F.Supp. 1225, 1233–34 n. 11 (S.D.N.Y.1978) (quoting S.Rep. No. 354, 95th Cong., 1st Sess. 7 (1977), *reprinted in* U.S.Code Cong. & Ad. News 527, 530). Accordingly, one court within this circuit has noted that the government personnel exception is not limited to federal employees, holding that grand jury transcripts could be disclosed to municipal officials assisting a grand jury investigation. *In re 1979 Grand Jury Proceedings,* 479 F.Supp. 93, 95–96 (E.D.N.Y. 1979). We likewise conclude that Moran, who worked exclusively for the government during the Lartey investigation and trial, providing it with expertise not possessed by permanent employees of the United States, fell within the "government personnel" exception to Rule 6(e). We find that Moran's review of Lartey's bank records was entirely proper. We therefore do not address the government's argument that dismissal of an indictment is an improper remedy for breach of grand jury secrecy.

### 2. *Lartey's Claims Regarding Count 6.*

Lartey was convicted on Count 6 of the indictment, which charged him with furnishing false information on, and omitting material information from, two DEA theft report forms, in violation of 21 U.S.C. § 843(a)(4)(A) (1976). Urging reversal, he contends (1) that he did not violate the applicable statute because he did not file the forms with the DEA, and (2) that the agents seized the forms unlawfully by a warrantless search of his briefcase.

■ The first ground is spurious. Lartey misreads the statute. The statute, 21 U.S.C. § 843(a)(4)(A) (1976), is not limited

to filing false reports but also prohibits furnishing "false or fraudulent information in ... any application, report, record, or other document required to be made, kept, or filed" under the Controlled Substances Act. Unquestionably, the theft report forms were records required to be *made* or kept as well as filed under the Act. *See* 21 C.F.R. § 1301.76(b). Lartey, therefore, violated 21 U.S.C. § 843(a)(4)(A) by making, keeping and furnishing false information.

Lartey's second argument—that the search of his briefcase was unlawful—poses a substantial question. Lartey's motion to suppress was denied by Judge Haight. The affidavits submitted conflict respecting the circumstances surrounding Lartey's arrest at the Grand General Pharmacy and the subsequent seizure of the theft report forms from his briefcase.

Everett Hatcher, the arresting agent, averred that:

The agents conducted an immediate "pat down" search and placed Lartey's briefcase on the floor next to him. When questioned regarding his inventory of controlled substances, Lartey responded that he needed the records in his briefcase which he opened with the agents' permission. The agents saw business records, an appointment book and personal items in the briefcase. Lartey then opened several folders containing business records and handed a theft report form to one of the agents who read it. The agents then took Lartey to the DEA's New York office, placing the briefcase in the trunk of their automobile. After arriving at DEA headquarters, Lartey asked to open the briefcase in order to consult an appointment book, and permission was granted. On numerous occasions thereafter, various articles from the briefcase were returned to Lartey upon his requests.

Lartey's account in two affidavits differs in every material respect from Agent Hatcher's. Lartey avers that he did not open the briefcase, nor show the agents any items which it contained either at the time of his arrest or thereafter. According to him, the briefcase was opened for the first time at DEA headquarters after the agents took it from his possession while he was under arrest and handcuffed. An inventory search of the briefcase was conducted at that time. Lartey swears that he retained possession of the briefcase while he was transported to DEA headquarters and denies showing the agents any business records or reports contained in the briefcase, including theft report forms.

Judge Haight did not hold an evidentiary hearing to resolve this factual dispute. Rather, for purposes of the motion, he assumed the truth of the facts stated in Lartey's affidavits and held that the search of the briefcase was a valid search incident to arrest. Judge Haight noted that "[t]he Second Circuit has consistently upheld warrantless searches, incident to arrest, of briefcases held by the accused at the time of arrest, even after the accused and his briefcase are taken to headquarters, on grounds of convenience to all concerned as well as courtesy to the accused. *See, e.g., United States v. Lam Muk Chiu,* 522 F.2d 330, 332 (2d Cir.1975), and cases cited therein."

The cases upon which Judge Haight relied, however, are of questionable validity in view of later decisions of the Supreme Court in *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), and *Arkansas v. Sanders,* 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979). In *Chadwick,* a warrantless search of a footlocker was held invalid when the footlocker was in the possession and under the exclusive control of the authorities after the defendants had been arrested and taken, along with the footlocker, to a federal building. Rejecting the government's contention that the search was a valid search incident to arrest, the Court noted that the exigency justifying such a search—the danger that the arrestee might gain access to the property to seize a weapon or destroy evidence—was not present. *United States v. Chadwick, supra,* 433 U.S. at 15, 97 S.Ct. at 2485–2486. Similarly, in *Sanders,* the issue was the validity of a warrantless search of a suitcase when it was under the exclusive control of the police. The search was held unlawful and not within the "automobile exception" to the warrant requirement because the suitcase had been secured and there was no

danger of loss of evidence or risk to the police. *Arkansas v. Sanders, supra,* 422 U.S. at 766, 99 S.Ct. at 2594. If one assumes the truth of Lartey's version of the facts, as did Judge Haight, the search was conducted not as an immediate search at the time and place of arrest, but as a pre-incarceration search after Lartey was arrested and when his briefcase was under the exclusive control of the agents. There was no danger under such circumstances that evidence would be destroyed or that harm would come to the agents. Absent these exigencies, there is no justification under *Chadwick* for a warrantless search as incident to a lawful arrest. *See United States v. Schleis,* 582 F.2d 1166 (8th Cir.1978) (en banc); *United States v. Jackson,* 576 F.2d 749 (8th Cir.), *cert. denied,* 439 U.S. 858, 99 S.Ct. 175, 58 L.Ed.2d 167 (1978); *United States v. Berry,* 560 F.2d 861 (7th Cir.1977), *cert. denied,* 439 U.S. 840, 99 S.Ct. 129, 58 L.Ed.2d 138 (1978).

There is a difference, however, between the factors justifying or invalidating a warrantless search as an incident to a lawful arrest and those governing a search of the personal effects of a person under lawful arrest as part of a routine administrative procedure at the police or agency's headquarters incident to booking and incarcerating the suspect. Recently, in *Illinois v. Lafayette,* —— U.S. ——, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983), decided long after Judge Haight upheld the challenged search, the Supreme Court held that "it is not 'unreasonable' for police, as part of the routine procedure incident to incarcerating an arrested person, to search any container or article in his possession, in accordance with established inventory procedures. *Id.* at ——, 103 S.Ct. at 2611.

There appears to be no conflict in the affidavits that some sort of warrantless search of Lartey's briefcase occurred. There is no finding in the record, however, to enlighten us as to whether this search occurred at DEA headquarters or earlier, immediately after Lartey's arrest, or whether Lartey consented, or whether, ab-

sent his consent, it was incident to a lawful arrest, or whether it was part of a routine standardized administrative procedure for making a valid inventory of Lartey's belongings as an incident to booking and incarcerating an arrested person.

The validity of the challenged search cannot be determined without resolution by the district court of these issues of fact. Accordingly, we reverse the judgment of conviction on Count 6 and remand that count for further proceedings consistent with this opinion. If the court determines that the search was lawful, Lartey's conviction on Count 6 should be reinstated.

3. *Remaining Claims.*

 Lartey argues that he was denied a fair trial because the court's charge was biased in favor of the government. He points to three passages in which the trial court informed the jury of conclusions which could be reached from the evidence.[6]

We have held that:

"The trial judge in a federal court may summarize and comment upon the evidence and inferences to be drawn therefrom, in his discretion.... So long as the trial judge does not by one means or another try to impose his own opinions and conclusions as to the facts on the jury and does not act as an advocate in advancing factual findings of his own, he may in his discretion decide what evidence he will comment upon. His fairness in doing so must be judged in the context of the whole trial record, particularly the evidence and the arguments of the parties." *United States v. Tourine,* 428 F.2d 865, 869 (2d Cir.1970), *cert. denied,* 400 U.S. 1020, 91 S.Ct. 581, 27 L.Ed.2d 631 (1971).

*Accord, Quercia v. United States,* 289 U.S. 466, 469, 53 S.Ct. 698, 699, 77 L.Ed. 1321 (1933). In the instant case, the court summarized the evidence and indicated the conclusions which could be drawn. The court did not offer its own factual findings, and Lartey has pointed to no inaccuracies in the court's summaries. Moreover, from the

---

**6.** For example, one of the passages Lartey cites concludes: "There has been a good deal of evidence in this case which would permit you

to conclude that a large number of prescriptions that were filled in the defendant's pharmacy at various times were facially invalid."

very outset of the trial and twice during the charge, the court made clear that the jury was the sole trier of the facts. The charge was unobjectionable.

▐ Counts 2 through 4 of the indictment charged Lartey with distributing, and possessing with intent to distribute, large quantities of Doriden and Empirin during 1980, 1981 and 1982, respectively, in violation of 21 U.S.C. § 841(a). Lartey contends that the indictment is multiplicious, charging one offense in several counts, because his illegal distribution over a period of years constitutes "a single continuing crime." He argues for reversal on the ground that his conviction on multiple counts and his sentence to consecutive terms violate the double jeopardy clause. We reject this argument.

It is the role of Congress to define crimes and to determine the appropriate punishment for these offenses. *Bell v. United States*, 349 U.S. 81, 82, 75 S.Ct. 620, 621, 99 L.Ed. 905 (1955). Section 841(a) of Title 21 makes it unlawful for any person knowingly and intentionally to distribute a controlled substance unless authorized by law. Under this statute, the term "distribute" means "to deliver," and the term "deliver" means "the actual, constructive, or attempted transfer of a controlled substance." 21 U.S.C. § 802(8), (11). The plain language of the statute indicates, therefore, that illegal distribution under § 841 is not a continuing crime. The law instead makes each unlawful transfer a distinct offense. Courts resolving this issue have uniformly held that separate unlawful transfers of controlled substances are separate crimes under § 841, even when these transfers are part of a continuous course of conduct. *See United States v. Thompson*, 624 F.2d 740, 743 (5th Cir.1980); *United States v. Noel*, 490 F.2d 89 (6th Cir.1974) (per curiam); *United States v. McDonald*, 531 F.Supp. 160, 163 (M.D.La.1982); *United States v. Gaertner*, 432 F.Supp. 805, 807, (E.D.Wis. 1977).

That each unauthorized delivery of a controlled substance violates § 841 is also apparent upon consideration of the Supreme Court's decision in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed.

306 (1932), and this court's ruling in *United States v. Santore*, 290 F.2d 51 (2d Cir.1959), *aff'd in part and rev'd in part on other grounds en banc*, 290 F.2d 74 (2d Cir.1960).

In *Blockburger*, the defendant was charged with violating a statute prohibiting the purchase, sale, dispensing, or distributing of various drugs except in or from the original stamped package. The defendant was found guilty on two counts which charged him with unlawful sales of morphine on successive days to the same purchaser. The Court rejected defendant's argument that these sales were a single offense, holding that:

"The Narcotic Act does not create the offense of engaging in the business of selling drugs, but penalizes any sale made in the absence of either of the qualifying requirements set forth. Each of several successive sales constitutes a distinct offense, however closely they may follow each other." *Blockburger v. United States, supra*, 284 U.S. at 302, 52 S.Ct. at 181.

In *Santore*, the defendant was charged with violating 21 U.S.C. § 174, a predecessor to § 841. That statute made it illegal to import, receive, conceal, buy or sell any narcotic drug contrary to law. Defendant was convicted on three counts of selling heroin on the basis of three sales that he made during the latter part of 1957. He argued that these sales were part of a continuous transaction and that it was improper to impose consecutive sentences for these violations. This court rejected these claims, holding that:

"[W]hile these sales may have all been part of one overall continuous transaction, they were each a crime punishable separately under 21 U.S.C. § 174." *United States v. Santore, supra*, 290 F.2d at 70.

Counts 2 through 4 were not multiplicious, for each count required proof of distribution in different calendar years. *See United States v. Edwards*, 366 F.2d 853, 872 (2d Cir.1966), *cert. denied*, 386 U.S. 919 (1967); *United States v. Kramer*, 289 F.2d 909, 913 (2d Cir.1961). The evidence introduced at trial overwhelmingly demonstrat-

ed that Lartey distributed Doriden and Empirin on hundreds of occasions from 1980 through 1982. If Lartey has any complaint, it is not that the indictment is multiplicious, but rather that it is duplicitous, charging numerous crimes in a single count. However, Lartey failed to raise this issue before trial as required by Rule 12(b)(2), Fed.R. Crim.P. Nor has he raised it as a ground for appeal. Under these circumstances, we shall not resolve the question of whether Counts 2 through 4 were impermissibly duplicitous. *See* Rule 12(f), Fed.R.Crim.P.; *United States v. Alessi,* 638 F.2d 466, 476 (2d Cir.1980); *United States v. Murray,* 618 F.2d 892, 899 n. 8 (2d Cir.1980); *United States v. Viserto,* 596 F.2d 531, 538 (2d Cir.), *cert. denied,* 444 U.S. 841, 100 S.Ct. 80, 62 L.Ed.2d 52 (1979); *United States v. Droms,* 566 F.2d 361, 363 (2d Cir.1977) (per curiam).

Accordingly, the judgment of conviction on Count 6 is reversed, and that count is remanded for further proceedings consistent with this opinion. In all other respects, the judgment of conviction is affirmed.