UNITED STATES of America, Appellee,

v.

George Robert GORSKI,
Defendant–Appellant.

No. 1195, Docket 88–1054.

United States Court of Appeals,
Second Circuit.

Argued June 3, 1988.
Decided July 26, 1988.

Thomas G. Dennis, Federal Public Defender, Hartford, Conn., for defendant-appellant.

Donna L. Fatsi, Asst. U.S. Atty., Hartford, Conn., for appellee.

Before LUMBARD and MINER, Circuit Judges, and CONNER, District Judge.[*]

WILLIAM C. CONNER, District Judge:

On November 30, 1987, Robert Gorski entered a conditional plea of guilty, pursuant to Rule 11(a)(2), Fed.R.Crim.P., to one count charging him with conspiracy to distribute cocaine in violation of 21 U.S.C. § 846. Gorski now appeals the decision of the United States District Court for the District of Connecticut (Peter C. Dorsey, Judge), entered on October 20, 1987, denying Gorski's motion to suppress evidence discovered during a search conducted incident to his arrest, and to suppress inculpatory statements which Gorski made following his arrest. We affirm in part and reverse and remand for further proceedings in part.

*Background*

On April 6, 1987, Special Agent Richard Foster of the Federal Bureau of Investigation ("FBI") received a telephone call from Alfred Catucci. Catucci told Foster that an individual referred to as "Whitey" had called the previous weekend and asked if Catucci was interested in "doing business," which he understood to mean cocaine business. Catucci said that he told Whitey he was not interested, but that his sons Ron and Tom Catucci would be. Ron and Tom previously had been convicted on narcotics charges and were cooperating with the government in narcotics investigations.

On April 15, 1987, Alfred Catucci called Foster again and told him that "Whitey" had just called to say he would be arriving at Bradley Airport the following day. Foster then spoke to Ron Catucci who told Foster that "Whitey", whose real name was Robert Gorski, would be arriving at 1:30 on April 16th to discuss the possible sale of cocaine. Ron Catucci agreed to meet Gorski at the airport and to wear a body wire and transmitter so that FBI agents could monitor his conversation with Gorski.

On the following day at about 1:25 p.m., Foster saw Ron Catucci meet Gorski. Gorski entered Catucci's car and both drove to Catucci's fish store in Unionville, Connecticut. During the ride, Gorski described his cocaine dealings in the Denver area. Gorski reported that his current source for cocaine was Ralph Yanes of Miami, Florida, who charged him $23,000 per kilogram. Catucci said that he would like to resume his cocaine business, but that he had no one reliable to go with him to Miami and deal directly with Yanes. Gorski volunteered to have his own "mule" pick up the cocaine in Florida and bring it to Connecticut.

After a brief stop at Catucci's store, the two men went to a pay phone to call Yanes and inquire about a price for the cocaine. Evidently Yanes was not at home, and the two men agreed that Ron Catucci would contact Yanes himself and then call Gorski in Denver, give him the price and make arrangements for delivery. Ron Catucci then drove Gorski to the airport for his return flight to Denver.

On the following day, Ron Catucci again called Yanes in Florida, with the FBI recording the conversation. After telling Yanes that he had spoken with "Whitey," Catucci was told by Yanes that the price would be "23." Catucci said that he could not come down to Florida but that Whitey would arrange for the delivery.

On April 21, 1987, Al Catucci told Foster that Gorski had called for his son Ron. Later that day, in a conversation that was also recorded, Ron told Gorski that the "fish" would cost "23 bucks." Foster understood this to mean that the kilogram of cocaine would cost $23,000. Gorski told Ron that he had anticipated that price.

On April 26, 1987, Ron Catucci spoke with Foster and told him that Gorski had called and had implied that he was in the New Haven, Connecticut area. On the following day at about 3 p.m., Ron Catucci told Foster that he had just received a call from Gorski who said he was at a restaurant across the street from the Hartfort,

* Hon. William C. Conner, United States District Judge, United States District Court for the Southern District of New York, sitting by designation.

Connecticut train station. Gorski said the cocaine would be arriving at about 5:00 p.m., and that he wanted to meet Ron Catucci at about 4:00 p.m. at the restaurant.

Shortly before 4 p.m., Foster fitted Ron Catucci with a transmitter and sent him into the restaurant to meet with Gorski. Portions of the conversation between Catucci and Gorski were overheard by FBI agents in the area. Gorski was heard saying that "his man," which Foster understood to mean his courier, would be arriving by bus at approximately 5:30 p.m. Gorski said the man looked like Edward G. Robinson. Foster heard Gorski tell Catucci that he believed the "mule" would be arriving at the Trailways Station.

A few minutes after 6 p.m., a surveillance agent at the bus station reported to Foster that Gorski had met someone and was carrying that person's bag. Within seconds, Foster saw Gorski, carrying a black vinyl bag, walking with a man who matched Gorski's description of the courier. Agents watched the pair continuously, and when the two men approached Catucci at his car, the agents moved in to arrest the three men. With guns drawn, they shouted "FBI" and ordered the men to put their hands on top of the car. As the arrest was made, Foster took the black bag from Gorski and set it on the ground at one side, and both defendants were frisked and handcuffed. Almost immediately thereafter, Foster unzipped the black bag and opened it, finding inside no weapons but a package wrapped in plastic and bound with plastic tape. From prior narcotics investigations, Foster recognized the packaging as similar in size, shape and appearance to that commonly used to contain a kilogram of cocaine.

Gorski and the other man, Joseph Cabrera, were advised of their rights and said they understood them. Gorski indicated that he did not want to make a statement, and both men were taken to the FBI office for booking. Once there, Foster punched a hole in the end of the wrapped package and removed a sample of white powder on which he conducted a field test which proved positive for cocaine. He then sent the whole kilogram to the laboratory for tests which confirmed that the package contained cocaine. While at FBI headquarters, Gorski, who had already been advised of his *Miranda* rights twice by other agents, was questioned by Foster and made incriminating statements.

On June 10, 1987, Gorski filed a motion to suppress the evidence found as a result of the search of the black bag, and the statements made to Foster. Following an evidentiary hearing, the district court ruled that the warrantless search of the bag at the bus station was not incident to Gorski's arrest, was not compelled by exigent circumstances and was not pursuant to any administrative inventory procedure. The court refused to suppress the evidence, however, finding that its ultimate discovery was inevitable. *See Nix v. Williams*, 467 U.S. 431, 434, 104 S.Ct. 2501, 2504, 81 L.Ed.2d 377 (1984). The court also denied the motion to suppress Gorski's statements to Foster finding that they were made "voluntarily and in an exchange which was not initiated by any questions asked of him." *United States v. Yanes*, 671 F.Supp. 927, 933–34 (D.Conn.1987).

*Discussion*

Foster attempted to justify his initial search of the black vinyl bag as incident to a lawful arrest and as a security precaution. The district court found that the events which transpired at the bus station prior to the arrest, which conformed with the plans described by Gorski in his previous conversations monitored by the FBI, gave the federal agents a reasonable basis for believing that Gorski and Cabrera were in the process of delivering a kilogram of cocaine to consummate the previously arranged sale. There was also reason to believe that the bag contained the cocaine. Accordingly, probable cause then existed for the arrests and the seizure of the bag.

However, an immediate search of the bag without a warrant would be permitted only if exigent circumstances existed. Exigent circumstances are one of the few "jealously and carefully drawn" exceptions to the need for a search warrant. They have been found to exist only in

"those cases where societal costs of obtaining a warrant, such as danger to law officers or the risk of loss or destruction of evidence outweigh the reason for prior recourse to a neutral magistrate." *Arkansas v. Sanders*, 442 U.S. 753, 759, 99 S.Ct. 2586, 2591, 61 L.Ed.2d 235 (1979). In analyzing whether exigent circumstances were present in this case so as to justify a warrantless search, the district court, following an evidentiary hearing found that

> [t]he bag belonged to Cabrera. It was turned over to Gorski. At the scene of the arrest, it had been taken from Gorski, both defendants were placed under arrest and handcuffed, and the bag was placed on the ground, all in the presence of several agents, all of whom had their guns drawn. The bag was thus not accessible to either defendant. It was not mobile in the sense that the bag was going nowhere other than with the agents to the Federal Building. There was neither a risk of a defendant getting to a weapon in the bag nor a risk of a defendant destroying or absconding with evidence from the bag. Though the government argues that the search was lawful as incident to the arrests, presumably as security procedure, that claim cannot stand. The facts at the time of the search suggest no exigency in the form of a risk of either harm to the agents or loss of evidence. *Yanes*, 671 F.Supp. at 931 (D.Conn.1987).

Based on these findings, which are amply supported by the record, the district court properly found that the warrantless search was not justified by exigent circumstances since the bag was inaccessible to the suspected drug dealers and "there was not the slightest danger that [the luggage] or its contents could have been removed before a valid search warrant could be obtained." *Sanders*, 442 U.S. at 762, 99 S.Ct. at 2592, *quoting United States v. Chadwick*, 433 U.S. 1, 13, 97 S.Ct. 2476, 2484, 53 L.Ed.2d 538 (1977). The government's other claim that the bag was searched initially pursuant to an established inventory procedure was found by the district court to be meritless and is unsupported by anything in the

record. Accordingly, the initial search was properly ruled to be unlawful.

Nevertheless, the district court denied the motion to suppress the evidence in reliance on the Supreme Court's decision in *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). There the Court held that evidence concerning the location and condition of the body of a ten-year-old girl whom the defendant had murdered could be introduced at his retrial, even though the police were led to the body through admissions elicited during custodial interrogation found unconstitutional in an earlier appeal. The Court in *Nix* observed that the body would have been discovered without the defendant's admissions because a search had been in progress at the time and search-team members were close to the location of the body.

■ The inevitable discovery doctrine is an exception to the exclusionary rule; it permits evidence to be admitted, even though it was obtained unlawfully, when the government can show that discovery of the evidence by lawful means was inevitable. This exception is necessary to ensure that "the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse*, position that they would have been in if no police error or misconduct had occurred." *Id.* at 443, 104 S.Ct. at 2509 (emphasis in original).

In the present case, the inventory search of the bag at the FBI office was a proper incident of Gorski's lawful arrest and detention under the Supreme Court's ruling in *Illinois v. Lafayette*, 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983). In that case, Lafayette was arrested for breach of the peace. As he was being booked, he placed his shoulder bag on the counter. An officer opened it and found amphetamines. Based on that discovery, Lafayette was prosecuted for possession of illegal drugs. In rejecting Lafayette's claim that the search of his shoulder bag violated his Fourth Amendment rights, the Court held that "it is not 'unreasonable' for the

police, as part of the routine procedure incident to incarcerating an arrested person, to search any container or article in his possession, in accordance with established inventory procedures." 462 U.S. at 648, 103 S.Ct. at 2611. The police may conduct the inventory search without probable cause and without obtaining a search warrant. *Id.* at 643, 103 S.Ct. at 2608. The Court discussed the range of governmental interests which support this type of search including the need to remove dangerous items from the property, to deter police thefts or false claims of theft, to deter allegations that the police did not seize the particular items from the arrested person, and to prevent theft or mishandling of articles taken from the arrested person. *Id.* at 646, 103 S.Ct. at 2609.

Shortly after the Supreme Court's decision in *Illinois v. Lafayette,* this Court confronted a similar factual scenario in *United States v. Lartey,* 716 F.2d 955 (2d Cir.1983), where the defendant's briefcase was searched at Drug Enforcement Agency headquarters following his arrest. The district judge, without conducting an evidentiary hearing, held that the search of the briefcase was valid as incident to arrest. On appeal, this court remanded the case to the district court to conduct an evidentiary hearing and resolve disputed facts concerning this issue. In discussing the possible results of the evidentiary hearing, this Court took note of the Supreme Court's recent decision in *Illinois v. Lafayette,* and directed the district court to consider the possibility that the search of the briefcase "was part of a routine standardized administrative procedure for making a valid inventory of Lartey's belongings as an incident to booking and incarcerating an arrested person." *Id.* at 966. The clear implication of that ruling is that if the district court so found after the evidentiary hearing, the evidence would be admissible under *Illinois v. Lafayette.*

Here, Gorski and Yanes had been under surveillance by law enforcement authorities for a number of days prior to the arrest as well as during the actual sale of cocaine. Law enforcement officials knew with reasonable certainty that Gorski was in the process of consummating a cocaine sale at the bus station. It is therefore clear that, even if the bag had not been searched at the time of the arrest, Gorski would have been brought to the FBI office to be booked and detained at least until he could be brought before a magistrate. Although under *Illinois v. Lafayette* it would have been proper to conduct an inventory search of Gorski's bag incident to such detention, it does not follow that such a search was inevitable.

The district court found that:

[h]ad the bag remained intact after the arrest, its contents would have been disclosed at the inventory. That process clearly would have occurred and it was not dependent upon, nor would it have been brought about by reason of, nor would it have followed upon (except in time), the illegal search. *Yanes,* 671 F.Supp. at 933 (citations omitted).

■ The finding that Foster's search of the bag at the FBI office would inevitably have led to the discovery of the cocaine is clearly correct. However, there was no evidence to support the further necessary finding that it was inevitable that such an inventory search would be conducted. A thorough review of the record reveals no evidence that such searches were an invariable, routine procedure in the booking and detention of a suspect at the particular FBI office involved. Indeed, the only mention of the inventory search was the brief statement in Foster's testimony that "[a]n inventory was done later at my office. We searched the bag for cocaine and weapons." Government's Appendix at 15.

We therefore have no alternative but to reverse the district court's order denying Gorski's motion to suppress the evidence found in the search of the bag and to remand for an evidentiary hearing on the factual issue whether an inventory search of the bag was a routine procedure incident to booking and detention of a suspect at the FBI office in question. If the evidence adduced at the hearing establishes that it was, it would follow that the cocaine in the bag would inevitably have been discovered

through lawful means and is therefore admissible under the rule of *Nix v. Williams.* Accord *United States v. Andrade,* 784 F.2d 1431 (9th Cir.1986).

 Finally, we conclude that Gorski's statements to Agent Foster were admissible, as the district court held. There was ample evidence indicating that Gorski was twice informed of his *Miranda* rights. While he initially declined to make any statements, it is clear from the record that when he reconsidered and agreed to talk to Agent Foster, his

> reconsideration [was] urged in a careful, noncoercive manner at not too great length and in the context that [the] defendant's assertion of his right not to speak [was] honored.

*United States v. Collins,* 462 F.2d 792, 797 (2d Cir.), *cert. denied,* 409 U.S. 988, 93 S.Ct. 343, 34 L.Ed.2d 254 (1972). Accordingly, the *Miranda* mandate was not violated. *Id.*

For the reasons set forth above, that portion of the district court's order denying Gorski's motion to suppress the cocaine is reversed and remanded for further proceedings consistent with this opinion. The denial of Gorski's motion to suppress his inculpatory statements is affirmed.

LUMBARD, Circuit Judge, concurring and dissenting:

I concur in affirming the denial of Gorski's motion to suppress his statements to government agents after his arrest. I dissent from the court's remand for inquiry into whether an inventory search of the bag was a routine procedure.

Given the conversation overheard two hours earlier between Gorski and Catucci, the agents had every reason to believe that Cabrera had delivered to Gorski a bag containing a kilogram of cocaine. Thus, the agents had probable cause to arrest Gorski. When they approached Gorski and Cabrera with guns drawn, Gorski and Cabrera were ordered to put their hands on top of the car. As they did so, Foster took the bag from Gorski and put it on the ground. As an article which was in Gorski's possession

at the time of his arrest it was subject to search then and there without delay.

The reasons for allowing, indeed expecting, officers of the law to search an arrestee upon arrest are well recognized and beyond question. The officers must make sure for their own safety and the safety of bystanders that the person arrested has no weapon with which to resist arrest. Because a search for weapons is always permissible, it is well established that any evidence of crime discovered in the course of such a search is subject to seizure. *See United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). The appearance and weight of the package confirmed the belief of the officers that it contained the kilogram of cocaine. Even so, it is elementary law enforcement to guard against possible surprise.

No warrant was necessary. There is no reason in cases as plain and certain as this one to require any blessing from a judicial officer or to establish that a later inventory search would have led to the same result.

I would affirm the judgment in all respects.