## UNITED STATES

v.

Gustavo **AGUIRRE–PARRA, Carlos Rodriguez, a/k/a "Federico, or Fred, Ortega–Suarez," Orlando Gill, Fernando Salcedo–Castillo, a/k/a "Coco", and Herman Varela, Defendants.**

No. 90 Cr. 533 (RPP).

United States District Court, S.D. New York.

April 18, 1991.

As Amended May 15, 1991.

Otto Obermaier, U.S. Atty., S.D. N.Y., New York City by Robert W. Ray, Asst. U.S. Atty., for U.S.

Schulman & Laifer, Brooklyn, N.Y. by Barry Schulman, for defendant Gustavo Aguirre–Parra.

Miller and Forman, Miami, Fla. by Daniel H. Forman, for defendant Carlos Rodriguez.

Handelman, Hurwitz, Stampur & Roth, New York City by William J. Stampur, for defendant Orlando Gill.

Larry Ruggiero, New York City, for defendant Fernando Salcedo–Castillo.

Mario Malerba, Kew Gardens, N.Y., for defendant Herman Varela.

## OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

Defendant Fernando Salcedo–Castillo, also known as "Coco" ("Salcedo–Castillo"), brings an omnibus motion for 1) a bill of particulars, 2) discovery pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), 3) disclosure of Jencks Act material under 18 U.S.C. § 3500, 4) discovery of lists of government witnesses and the identities and whereabouts of confidential informants, 5) advance disclosure of proof to be offered under Rules 104, 403 and 404(b) of the Federal Rules of Evidence, 6) a pretrial evidentiary hearing to determine the admissibility of co-conspira-

tor declarations which the government may submit at trial, 7) severance pursuant to Rules 12(b)(5) and 14 of the Federal Rules of Criminal Procedure, 8) the suppression of items seized from defendant upon his arrest and items seized at the Royce Hotel, where defendant allegedly stayed.

Defendants Gustavo Aguirre–Parra ("Aguirre–Parra"), Carlos Rodriguez, also known as Federico Ortega–Suarez ("Rodriguez"), Orlando Gill ("Gill"), and Herman Varela ("Varela") join in the omnibus motion. Defendant Varela has separately moved to suppress his post-arrest statements and a hearing has been ordered on that motion.

Defendant Gill separately moved to suppress his post-arrest statements and evidence seized during as search of a room at the Royce Hotel at La Guardia Airport which was registered in Gill's name; the Court held an evidentiary hearing on February 13, 1991 as to Gill's motion to suppress evidence and denied it from the bench on the grounds that Gill was adequately informed of his rights, that he did consent to the search of the room at the Royce Hotel, and that his consent was voluntary. *See* Transcript of Hearing, February 13, 1991, at 55; Government's Letter of December 12, 1990, Exhibit B; Affidavit of Orlando Gill, December 21, 1990.[1]

Defendant Aguirre–Parra moves in addition for 1) suppression of his name on the government's transcriptions of certain tapes, 2) the suppression of identification testimony as to him, or, in the alternative, a pretrial hearing as to the identification procedures, 3) discovery and inspection of items believed to be in the government's possession and potential evidence in the government's case, 4) discovery of specific information listed as an appendix to his Notice of Motion.

By supplementary motions, on February 19, 1991, Aguirre–Parra's counsel challenges the existence of probable cause to arrest Aguirre–Parra and on March 7, 1991

also moves to suppress all evidence seized from the defendant's home at the time of his arrest, on the grounds that the arrest at his home was warrantless, without probable cause or justifying circumstances, and that Aguirre–Parra did not consent to the search. Aguirre–Parra's counsel also moves to suppress the fruits of any evidence seized or information obtained during an alleged stop and search of Aguirre–Parra and search of his home by federal agents during the summer of 1990. The Court reserves decision on Aguirre–Parra's supplementary motions pending a hearing held on April 12, 1991, at 10 a.m., to be continued on April 19, 1991, as to the circumstances of his arrest and the search of his home, and further discovery as to the alleged earlier stop and search.

By letters of October 9, 1990, December 12, 1990, January 22, 1991, and March 27, 1991, and undisputed statements in open court, the government has disclosed to all defense counsel the physical evidence in its possession, has allowed them to inspect it, and has provided any requested photocopies. The defense has been given copies of the photos, photo spreads and photo arrays used to identify the defendants. Upon inspecting the evidence, Salcedo–Castillo withdrew his motion to suppress evidence seized at the Royce Hotel. However, since the motion was adopted by other defendants, the Court will address the issue below.

## BACKGROUND

### 1. Generally Applicable Facts

Defendants are charged as co-conspirators in an indictment alleging a scheme to possess and distribute large amounts of cocaine, in violation of 21 U.S.C. §§ 812, 841(a)(1) and 841(b)(1)(A). The facts according to the indictment, the complaint signed by Special Agent David Schwefel ("Agent Schwefel") of the Drug Enforce-

---

1. Gill's affidavit of December 21, 1990 states that he was registered at the Royce Hotel near La Guardia Airport at the time of the seizure, that he slept in the room and kept some personal belongings there, and that he was not advised of his *Miranda* rights. Gill did not testify at the evidentiary hearing on his motion to contradict the testimony of DEA Agent Edward Oberti about his post-arrest statements and consent to search.

ment Agency ("DEA"), dated August 2, 1990, the affidavit of DEA Assistant Special Agent in Charge John H. Toal ("ASAC Toal"), dated February 4, 1991, and the transcripts of tape recordings made available to the Court and the defendants are as follows.[2]

On or about May 11, 1990, in the vicinity of the Douglaston Shopping Center and the Toys–R–Us store, in Queens, New York, a man using the code name "Cobra" provided two confidential informants of the DEA, CI–1 and CI–2, and Rony Castillo with $95,-000 in cash to cover a portion of certain expenses to be incurred in connection with the transportation and delivery to Cobra of approximately 496 kilograms of cocaine from Colombia to the United States. Payment for the cocaine apparently had not been made but would be due on delivery. Cobra was described by the informants as a Colombian male with a mustache, who drove a late-model, grey Lincoln Continental Town Car. On May 11, 1990, in the vicinity of the New Orleans International Airport, Rony Castillo provided an undercover agent of the DEA ("UC–1") with a package containing approximately $65,000 in cash.

On or about July 12, 1990, in the vicinity of a beach on the Pacific Coast of Guatemala, CI–2 and Agent Schwefel received approximately 496 kilograms of cocaine from a fishing vessel which had come from Colombia.

On or about July 18, 1990, a third confidential informant ("CI–3") met a Colombian male with a mustache who used the name "Cobra" in the vicinity of 30th Avenue and 75th Street, Queens, New York and went to Cobra's house at 25–16 72nd Street, East Elmhurst, Queens, New York, where Cobra gave him $300,000 in cash. Surveying DEA agents reported that Cobra drove a late-model, grey Lincoln Continental Town Car bearing New York livery license plate number T53845C, which plate was registered to Gustavo Aguirre, 25–16 72nd Street, East Elmhurst, New York, who was identified from a previous arrest on March 10, 1988, as defendant Gustavo Aguirre-Parra.

On July 20, 1990, a DEA confidential informant in New Orleans using the code name "Barbas," who has been identified as CI–1, called a beeper number, (212)278-5150, using an identification number of 55, and left the telephone number where he could be reached. A man using the code name "Cobra" returned the call. Cobra indicated interest and familiarity when CI–1 described himself as "Alex's uncle" and told Cobra that "Alex" had given him Cobra's number. Cobra referred to related telephone conversations Cobra had had with Alex about the pending deal. He also questioned CI–1 about previous calls CI–1 had made to his number and confirmed that 55 was the correct identification code to use. When CI–1 repeated back the telephone number he had dialed, (212)278-5150, Cobra said "That's my number." Cobra showed a willingness to do business and a familiarity with the activities of CI–1 and "Ronnie,"[3] and he agreed to provide "25" in exchange for CI–1's courier making "something available," because CI–1 told him he was "short of ... fabric,"[4] with another "400" to change hands when a portion of the "product" was delivered. When CI–1 asked Cobra if he was the one who met previously with CI–1, "Ronnie" and "Guayo" in a parking lot in New York, Cobra said "Yes." When CI–1 continued with a description of Cobra's car as a grey Continental or Chrysler, Cobra said "Yes." When CI–1 tried to ask another question, Cobra interrupted, "I'm not that one, but ... a friend of mine is, yes." New Orleans Transcript, N–12, July 20, 1990.[5]

---

**2.** This Opinion quotes from the draft English translations supplied with the transcripts; most of the conversations actually took place in Spanish.

**3.** This is a phonetic transcription of the name, contained in the draft transcript/translations.

**4.** "Fabric" is used in the tape-recorded conversations as a synonym for money.

**5.** "Transcript" refers to the transcripts and the translations of phone calls which were taped by the DEA. Those transcripts and translations have been made available to the Court and to all defense counsel.

On or about July 22, 1990, CI–2 received $25,000 from two unidentified Colombian males in the vicinity of the Sheraton Hotel in midtown Manhattan.

On July 24, 1990, at 4:40 p.m., CI–1 called 278–5150 and left the number of the Parker Meridian Hotel in New York. While waiting for a return phone call, CI–1 received a telephone call from "Alejandro," from Cali, Colombia, who confirmed that Cobra's number is 278–5150, that he had another number, 905–6449, and that CI–1 should identify himself by punching in the number 55. When CI–1 spoke of difficulty in reaching Cobra, Alejandro agreed to try and get Cobra to call the confidential informant. Transcripts, N–5, July 24, 1990.

At 6 p.m. on July 24, 1990, Cobra called CI–1, stated he was busy and instructed CI–1 to call "Cheo" at (212)457–7011 using the same identification number code, 55, that the informant had used to reach Cobra. Transcripts, N–6, July 24, 1990. Cheo's number was called and Cheo called back at 7:30 p.m. during which call Cheo stated that he, Cheo, had already spoken with Cobra. Cheo and CI–1 arranged to talk the next day, using a beeper number which CI–1 gave Cheo. Transcripts, N–7, July 24, 1990.

On July 25, 1990, a telephone conversation took place at 12:07 p.m. between CI–1 and Cheo, in which Cheo said that he was going to meet Cobra at one o'clock, that they would solve a "small problem with the fabrics" and that they would be "getting in touch with 'mi papa' out there" (evidently meaning the people in Colombia). Transcripts, N–8, July 25, 1990.

On July 26, 1990, there were two telephone conversations between Cheo and CI–1, setting up a meeting at which "175" was to be exchanged for "a quarter of all that, which is 125 people ..." with another "200" to be paid two days later.[6] Cheo stated he would send a man and a woman with a child to the meeting. CI–1 told him that the man and woman should bring "the briefcase" and would receive the keys to a car, a blue Ford, which he states must be returned later to "Budget." Transcripts N–10, N–11, July 26, 1990.

On July 26, 1990, in the vicinity of the Parker Meridian Hotel, on West 57th Street, a DEA undercover agent posing as CI–2 received $175,000 in cash from two Colombians, an unidentified male and an unidentified female with a child. The agent did not supply the cocaine as expected. That afternoon, Cheo had a telephone conversation with "Dave," another DEA undercover agent, in which "Dave" stated he wanted $200,000 more before making delivery, referring to the "original deal" of "400,000" for "250 packages," and Cheo asked, "[Y]ou're not going to return our 175,000?" Transcripts, N–13, July 26, 1990. Several more telephone conversations with Cheo occurred on the same subject that day.

On July 27, 1990, CI–1 had telephone conversations with Alejandro and "Jaime" in Cali, Colombia, in which Jaime told CI–1 that the errand would be run by "Carlos" from that point on, gave him a telephone number, (212)871–1157, and told him to ask for Carlos. Jaime then added, "The moment you talk to him you then you two guys set it up." Jaime also said "One of, of my friends, Cobra, told me that one of your friends, a Hispanic, was very jittery, very jittery." When CI–1 said that he, CI–1, got together with Cheo, but only Cheo, Jaime said "Oh, so it was you who was jittery." Jaime then stated he will get "that money" for CI–1 between that day and the next. When CI–1 asked what Carlos looked like, Jaime said, "You know him. If you see him, you'll remember." He later repeated that CI–1 would recognize Carlos when he saw him. Transcripts, N–16, July 27, 1990.

CI–1 called (212)871–1157 on July 28, 1990 and eventually succeeded in reaching Carlos. Carlos reiterated his plans to go back to Miami early on July 29, 1990 and to

---

**6.** "175" appears to mean $175,000. "One quarter of all that" appears to mean one quarter of 496 kilograms. "125 people" appears to mean 125 kilograms, "200" appears to mean $200,000, for which Cheo would receive another "quarter of all that."

"be back Monday" with the money.[7] Carlos gave CI–1 his beeper number in Miami, (305)352–5659. There followed a number of telephone conversations between CI–1 and Carlos, one to the Miami number Carlos had given CI–1, mainly about the delay in getting "fabric." In one conversation, Carlos and CI–1 discussed setting up a meeting and how they would recognize each other. CI–1 described what he would be wearing and Carlos responded, "Are you [G]uayo?" When CI–1 said yes, Carlos said, "I know you." Transcripts, N–21, July 31, 1990. There were also conversations between CI–1 and Alejandro and Jaime in Colombia, in which it was claimed Carlos had the money. Transcripts, N–16 *et seq.*, July 28, 29, 30, 1990.

On July 31, 1990, CI–1 called Cobra and recounted the problems of delay with Carlos, and also recounted past difficulties with Cheo. Cobra said "Cheo was an intermediary with me because I couldn't at time. And we agreed on something and you were the ones who fucked up … And that's what we agreed on. We go the next day, we give them the money and we go, and they give us the keys to a car that wasn't meant to be or anything like that … [W]e even got panicky. Because I said to [ ], 'That man has to be something strange.' I called him down there and told mi papa …" Cobra then recounted many of the details of the deal which, in his view, had gone awry. He told CI–1, "Chespirito down below said to me, 'Stay away from it. Let this other guy.' So I stayed away." Cobra and CI–1 then went over the details of the original deal and what had gone wrong with the exchange. Cobra ended by agreeing he would call his "papa" and find out what role Carlos played and call back. He said, "Let's see if we can solve that problem, because we're all—I'm stuck, to tell you the truth…. I'm stuck, you're stuck, and nobody has done anything." Transcripts, N–24, July 31, 1990.

On August 1, 1990, at about 10:45–11:00, Cobra called CI–1 and said he had just talked to his "papa" and was told Carlos would take care of the errand. He said to call Carlos back and tell him to "try and do it today. Because it's even in my best interest—it's in everybody's best interest…. If you don't manage to solve it, give me another call to see what we do." Transcripts, N–26, August 1, 1990.

On August 1, 1990, CI–1 kept an appointment made with Carlos to meet at "Au Petit Beurre," a coffee shop in the vicinity of 105th Street and Broadway in Manhattan, New York, with a man who would set up the delivery of the remaining payment for half of the 496 kilograms and for receipt of its delivery. DEA agents observed CI–1 in Au Petit Beurre at 6 p.m., meeting defendant Gill, and watched Salcedo–Castillo entering the coffee shop and observing CI–1 and Gill during their meeting. When Gill stood to leave, Salcedo–Castillo did also. When Gill sat back down, so did Salcedo–Castillo. Gill then left the coffee shop and entered a car driven by defendant Varela, at 104th Street and Broadway. At some point, Carlos Rodriguez entered the car which then drove by Au Petit Beurre. As the car drove by, Gill ducked his head down out of view and Carlos Rodriguez was observed looking inside the coffee shop. Shortly thereafter, Gill left the car, re-entered the coffee shop, told CI–1 that Carlos would call him later and left. Gill then walked a few blocks to the vicinity of Varela and Rodriguez and all three were arrested. Salcedo–Castillo stayed in the coffee shop until CI–1 left and then started to leave, at which point he was arrested.

2. Orlando Gill, Carlos Rodriguez, Herman Varela and Fernando Salcedo–Castillo

After Gill's arrest, he gave a statement to DEA agents which was the subject of his motion to suppress. Gill's statement will not be considered as evidence against any one of the other defendants. The statement describes how Gill, a resident of Miami, Florida, agreed on or about July 30, 1990, to fly from Miami to New York to drive a car in New York for pay and stayed in a hotel room near La Guardia Airport, which was registered in Gill's name. On or

---

**7.** July 28, 1990 was a Saturday; the following Monday was July 30, 1990.

about July 31, 1990, Gill made several trips to Manhattan to meet with a pre-arranged contact. He also received $3000 in payment for his services. Gill acknowledged he met with CI–1 in the coffee shop on August 1, 1990, as described above.

On or about August 1, 1990, DEA agents searched the hotel room registered in Gill's name at the Royce Hotel near La Guardia Airport, with Gill's written, voluntary consent. Exhibit B to Government's Letter of December 12, 1990. By letter of February 21, 1991, the U.S. Attorney's Office advised all defense counsel that it had in its possession the contents of four pieces of luggage which were seized in the search of Room 324 of the Royce Hotel. Items which the government considers of evidentiary value include $21,000 in cash, a plastic bag with the name Carlos Rodriguez written on it, and a baggage tag and hotel receipt from the La Guardia Marriott. Other items seized but not retained by the government were clothing and personal effects.

### 3. Gustavo Aguirre–Parra

#### a. *The Arrest and Post–Arrest Identification Procedures*

Defendant Aguirre–Parra was arrested on August 2, 1990, at his residence, at about 2 a.m.[8] The government's letter of January 22, 1991, indicates that on November 19, 1990, DEA agents showed Rony Castillo a photo spread which included a picture of Aguirre–Parra. *See* Government's Letter of January 22, 1991, Exhibit B. Castillo was unable to identify Aguirre–Parra from that spread. He was then shown a photo array containing the arrest photos of all five defendants and he positively identified Aguirre–Parra and Carlos Rodriguez. Exhibit C to Government's Letter of January 22, 1991. On November 20, 1990, CI–1 (one of the confidential informants who met "Cobra" on May 11, 1990) was shown the same photo spread (Exhibit B) and was unable to identify Aguirre–Parra. He was then shown the photo array (Exhibit C) and positively

identified Rodriguez, Gill and Salcedo–Castillo. After describing in detail the person he saw on May 11, 1990, who gave him and his companions $95,000 in cash for expenses related to transporting cocaine, CI–1 was shown the March 10, 1988 arrest photo of Aguirre–Parra and identified him as the same man. Exhibit D to Government's Letter of January 22, 1991. CI–2 was not shown any photos of Aguirre–Parra.

### DISCUSSION

### I. DISCOVERY

Material responsive to requests for discovery of all documents and information sought by defendants either has been produced by the government, or the government has represented to the Court that it does not now have any such material in its possession and will produce it in the event one comes into its possession. See Transcript of Oral Argument, January 29, 1991.

### II. SALCEDO–CASTILLO'S OMNIBUS MOTION

#### 1. Bill of Particulars

■■■ The motion for a bill of particulars is denied. Although Rule 7(f) of the Federal Rules of Criminal Procedure grants a court discretion to direct the prosecution to file a bill of particulars, such a bill is not necessary as long as the indictment provides each defendant with information about the charges against him in sufficient detail to provide adequate notice of the charges against him, including the essential elements and facts of the crimes charged, and to prevent prejudicial surprise at trial or the possibility of double jeopardy. *United States v. Torres,* 901 F.2d 205, 234 (2nd Cir.1990). *See also, United States v. Salazar,* 485 F.2d 1272, 1278 (2nd Cir.1973), *cert. denied,* 415 U.S. 985, 94 S.Ct. 1579, 39 L.Ed.2d 882 (1974). As demonstrated by the statement of facts, the defendants have been provided with the complaint, the indictment and much eviden-

---

**8.** The facts surrounding his arrest are the subject of a hearing before the Court and will not be discussed in this opinion.

tiary detail, including several affidavits by DEA agents, transcripts of telephone calls, surveillance photos and search evidence. In view of the above, a bill of particulars is unwarranted and the motion is denied. *Torres, supra,* at 234.

### 2. Disclosure of *Brady* Material

■ *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), requires that the prosecution disclose to the defense any evidence which tends to exculpate or favor the defendant, in sufficient time to assure a fair trial. The United States Attorney's Office has represented to the Court that it is not aware of the existence of any material which falls under the rule of *Brady,* but that if the existence of such material becomes known to the Assistant United States Attorney prosecuting the case, he will notify defense counsel and will make it available to defense counsel in advance of trial. Since none of the defendants has shown that extraordinary circumstances exist in the present case which require deviation from normal procedures, such assurances are adequate at this time. *United States v. Ruiz,* 702 F.Supp. 1066, 1069–70 (S.D.N.Y.1989). *See also, United States v. Bagley,* 473 U.S. 667, 675, 105 S.Ct. 3375, 3379, 87 L.Ed.2d 481 (1985); *United States ex. rel. Lucas v. Regan,* 503 F.2d 1, 3 n. 1 (2nd Cir.1974), *cert. denied,* 420 U.S. 939, 95 S.Ct. 1149, 43 L.Ed.2d 415 (1975) ("Neither *Brady* nor any other case ... requires that disclosures under *Brady* must be made before trial.").

### 3. Jencks Act Material

■ The motion for disclosure of Jencks Act material, also known as § 3500 material, is likewise denied, without prejudice to a similar motion upon commencement of the trial if necessary. The Jencks Act provides that in a federal criminal prosecution, "no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpena [sic], discovery, or inspection until said witness has testified on direct examination in the trial of the case." 18 U.S.C.A. § 3500(a). The

government is not obliged to disclose prior statements of a witness until the day that witness testifies on direct examination and then it is obliged to disclose only statements which relate to the subject matter of the witness' testimony. 18 U.S.C.A. § 3500(b). While some of the material may also fall under the *Brady* rule, neither the Jencks Act nor *Brady* require disclosure this far in advance of trial and accordingly the motion is denied.

### 4. Identities of Confidential Informants and Potential Witnesses

■ The motions for disclosure of the identities and whereabouts of confidential informants or potential witnesses, and specific information relating to such persons, are denied. The standard is whether a "specific showing of need for disclosure by the defendant" outweighs "a specific showing of need for concealment by the government." *See United States v. Munoz,* 736 F.Supp. 502, 506–07 (S.D.N.Y.1990) (citing *United States v. Cannone,* 528 F.2d 296, 302 (2nd Cir.1975)). The government has agreed to make available to the defense any confidential informants who will testify, on the same day that § 3500 material is made available and prior to their testimony, so that defense counsel may determine if the witnesses agree to speak to defense counsel and conduct any interview that may ensue. *See United States v. Saa,* 859 F.2d 1067 (2nd Cir.1988). Informants and potential witnesses in narcotics cases, especially cases involving large amounts of narcotics such as the 496 kilograms seized in this case, fear for their own safety and that of their families. *See, e.g., United States v. Taylor,* 707 F.Supp. 696, 703 (S.D.N.Y. 1989); *United States v. Ruiz,* 702 F.Supp. 1066, 1071 (S.D.N.Y.1989). To list those persons or their whereabouts in advance of trial in such cases is to invite witness intimidation or danger to confidential informants. The defense has not made a specific showing of need to depart from this practice and the government has agreed to make available, within reasonable limitations, any informant who will testify or

other witness. Accordingly, the motions are denied.

**5. Disclosure of Proof To Be Offered Under Fed.R.Evid.P. 404(b)**

■ The motion for disclosure of evidence of prior or subsequent similar acts is premature at this time and is denied. Rules 104 and 403 of the Federal Rules of Evidence do not require that the government disclose such material this early before trial and the government has represented to the Court that it will proffer to defense counsel, in advance of trial, any such evidence it intends to offer which it has not already disclosed to the defense. The Court should also receive a proffer of such evidence in time for it to make a prompt ruling during trial. At this point, the government's assurance is adequate. The motion is denied.

**6. Pre–Trial Hearing on Admissibility of Co–Conspirator Statements**

■ Neither Rule 104 nor Rule 801(d)(2)(E) of the Federal Rules of Evidence requires that the Court hold a pre-trial hearing to determine the admissibility of co-conspirator statements. The proper procedure is to determine the issues surrounding admissibility (the existence of the conspiracy, a particular defendant's role, whether the statements were made in furtherance of the conspiracy) during the trial, and, if necessary, outside the presence of the jury. Defense counsel have presented no reason why this will not suffice in the present case and accordingly the motion is denied.

**7. Severance**

■ The general rule in this circuit is that defendants who are indicted together and who are charged as co-conspirators should be tried together. *See, e.g., United States v. Nersesian*, 824 F.2d 1294, 1303–04 (2nd Cir.1987), *cert. denied*, 484 U.S. 957, 108 S.Ct. 355, 98 L.Ed.2d 380 (1987). This is so even though there may be different degrees of guilt or involvement, 824 F.2d at 1303, or if the defendant believes he would have a better chance of acquittal

in a separate trial, as long as a joint trial does not so severely prejudice the defendant that he does not receive a constitutionally fair trial. *Cf. United States v. Serpoosh*, 919 F.2d 835 (2nd Cir.1990). There has been no showing that a joint trial in this case will deprive any defendant of a constitutionally fair trial. Although the defense raises *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (admission into evidence of a co-defendant's statement implicating another defendant violates the latter's right to cross-examination), the concerns of *Bruton* may be met within the context of a joint trial. *Bruton* does not mandate severance in this case, since the government has stated that it will redact certain statements in accordance with *Bruton*. Accordingly, the motion for severance is denied.

**8. Suppression of Items Seized Upon Arrest and At The Royce Hotel**

■ Defendants Gill, Rodriguez, Salcedo–Castillo and Varela move to suppress items seized from them upon arrest on the ground that there was no probable cause to arrest them. They move for suppression of the items seized at the Royce Hotel on the ground that Gill did not have the authority to consent to a search of the hotel room or the items found within, such as luggage. Based on the information relating to the object of the meeting at Au Petit Beurre, contained in the transcripts of wiretapped phone conversations, the observations of the surveying agents as set forth in the sworn complaint of DEA Special Agent David Schwefel, there was ample probable cause to arrest Gill, Rodriguez, Salcedo–Castillo and Varela and accordingly, the motion to suppress any items seized upon arrest is denied. *See* Government's Letter of December 12, 1990, Exhibits D and E.

■ As to whether the search of the hotel room was conducted with valid consent thereto, it is the law in this circuit that one who has authority over common premises sought to be inspected may consent to such a search and his consent is valid as against an absent, non-consenting person

who shares authority, as long as the consenting party had a sufficient relationship with the premises, such as mutual use, or joint access or control. *United States v. Trzaska*, 859 F.2d 1118, 1120 (2nd Cir. 1988). In the present case, Gill's post-arrest statement and written consent to the search indicate that he had access to the room and control over it because he was staying there and the room was registered in his name. At the hearing of February 13, 1991, the Court ruled that his consent was voluntary.

■ Defendants contend, however, that Gill did not have authority to give third-party consent to a search of the luggage which was in the hotel room. The government answers that 1) any defendant other than Gill does not have standing to assert this claim since the only evidence seized from the luggage in the hotel room which the government plans to offer is $21,000 in cash which was found in a bag containing a hotel receipt signed by Gill, indicating that it was his bag or was used by him; 2) that any other defendant took the risk, by leaving his belongings in jointly accessible premises, that a codefendant might consent to such a search; and 3) that the seizure is valid also under the "inevitable discovery" doctrine. Whether or not the bag in fact belongs to Gill, the facts of this case resemble those in *United States v. Gradowski*, 502 F.2d 563 (2nd Cir.1974), in which the Second Circuit upheld Judge Tyler's ruling that when a third party who had been given the keys to a defendant's car and at whose house defendant had left the car, voluntarily consented to the search of the car's locked trunk, the consent was valid as against the defendant. "Consent to a search by one with access to the area searched, and either common authority over it, a substantial interest in it or permission to exercise that access, express or implied, alone validates the search." 502 F.2d at 564. By leaving their luggage in premises such as a hotel room registered in Gill's name, the defendants took the risk

that Gill could validly consent to a search of the hotel room, the seizure of their luggage and the search of the contents of their luggage.[9] Accordingly, the motion to suppress evidence seized at the Royce Hotel is denied.

## III. AGUIRRE–PARRA'S OMNIBUS MOTION

### 1. Suppression of Post–Arrest Statements

No motion to suppress post-arrest statements has been made by defendants Aguirre–Parra, Rodriguez and Salcedo–Castillo, although Aguirre–Parra raises the possibility.

### 2. Suppression Of Name On Transcriptions

Defendant Aguirre–Parra's name appears at certain places in the draft transcriptions of conversations on tapes N–6, N–24 and N–26. Aguirre–Parra asserts that the voice heard on those tapes is not his and moves to redact his name from the transcriptions. The government has agreed to redact his name in those places, replacing it with the name "Cobra," to which Aguirre–Parra has agreed. Accordingly, the motion is moot.

### 3. Discovery pursuant to *Brady* and Exclusion Of Such Evidence Not Disclosed

The government will provide *Brady* material as discussed *supra*. The motions are denied.

### 4. Suppression of Identification Testimony

■ Aguirre–Parra moves to suppress any in-court identification testimony as to himself, or, in the alternative, for a pre-trial hearing as to the out-of-court identification procedures used to identify him as "Cobra." The methods used by the DEA to identify Cobra have been set forth earlier. Government's Letter of January 22, 1991, at 2. CI–1 was shown a photo

---

**9.** The discovery of the contents of the luggage was inevitable, since the seizure of the bags occurred pursuant to Gill's consent and once they were seized, it was inevitable that their

contents would be discovered in a routine inventory of its contents. *See United States v. Gorski*, 852 F.2d 692, 696–97 (2nd Cir.1988).

spread, then a photo array, and finally a single photo of Aguirre–Parra, taken at the time of his arrest on March 10, 1988. *Id.* He was able to identify Aguirre–Parra from the latter arrest photograph as the man he met on May 11, 1990, who drove the Lincoln Continental Town Car and provided him and two others with $95,000 in cash.

Counsel for Aguirre–Parra cites *Kampshoff v. Smith,* 698 F.2d 581 (2nd Cir.1983) in arguing for the suppression of any identification testimony. However, the present case is somewhat different from the testimony the Second Circuit found improperly admitted in *Kampshoff.* There, a twelve-year-old witness testified to identify a man he had seen twice, for periods of about 10–20 seconds each, from a distance of 130 feet, under casual circumstances. 698 F.2d at 583. Here, the witnesses attended pre-arranged meetings with the defendant in which $95,000 in cash was to be exchanged. In the instant case, the witnesses were not observing casually but were there for the purposes of the meeting, one of which was to identify the transferor of $95,000. Eye-witness testimony under these circumstances is apt to be more reliable than the fleeting, casual and unintended observations described in *Kampshoff.* Under similar observational conditions, Rony Castillo was able to identify Aguirre–Parra from the photo array as the man who transferred the $95,000 on May 11, 1990.

After the meetings, Cobra identified himself as the man present at the meetings and as the driver of the grey Continental, and he knew who Rony was when he discussed with CI–1 the need for "25" to cover expenses. Aguirre–Parra also drives a grey Continental and another informant, CI–3, has reported that Aguirre–Parra used the name Cobra and engaged in a large transaction with him, involving $300,-000.

Although subsequent to the arrest, CI–1 could not identify Aguirre–Parra by a photo spread or photo array, when he was

shown an earlier photo of Aguirre–Parra taken after arrest on March 10, 1988, he identified the photo as one of the man who transferred the $95,000 on May 11, 1990. Although the last pre-trial identification procedure used by the government was suggestive, the Court finds that, under the reliability test set forth in *Manson v. Brathwaite,* 432 U.S. 98, 114–17, 97 S.Ct. 2243, 2253–54, 53 L.Ed.2d 140 (1977), the in-court identification of Aguirre–Parra should be allowed. The photographs of Aguirre–Parra in the government's possession are not of equal quality and contain significant differences. In at least one, Aguirre–Parra has no beard but has a long mustache, while in another the quality of the photo is such that it is difficult to tell how much facial hair he has; in yet another photo, he is bearded. *See* Exhibits B, C, and D to Government's Letter of January 22, 1991. In two photos, he has no glasses while in the third he does wear glasses. Under the circumstances, CI–1's difficulty with the photographs is somewhat understandable and does not necessarily indicate his trial testimony will be unreliable.

■ An in-court identification in this trial will be more reliable than in *Manson, supra,* because it will be a multi-defendant trial and not a one-defendant trial. Furthermore, defense counsel will have an adequate opportunity to challenge the identification testimony during cross-examination of witnesses and will have the use of the photo spreads and photo arrays to reinforce its presentation. The motion for suppression is denied.[10] A separate pre-trial hearing to explore the circumstances surrounding a non-identification by a witness would have no purpose and is unnecessary. Accordingly, the motion for a pre-trial hearing is also denied.

5. Discovery and Inspection Of Items In The Government's Possession and Of Other Information

Defendant Aguirre–Parra moves for the disclosure of certain information and in-

---

**10.** The Court notes that Justice Marshall, in his dissent in *Manson,* indicates that, at this point in the pre-trial proceedings, an in-person lineup conducted by the government under scrupulously fair circumstances is still available to the

government, to buttress any subsequent trial identification. *See Manson, supra,* 432 U.S. at 119, 127, 97 S.Ct. at 2255, 2259 (Marshall, J., dissenting). Thus, the Court's suppression of trial identification would be premature.

spection of evidence in the government's possession. The government has already allowed the defense to inspect the physical evidence in its possession and has provided all of the information requested, insofar as the government possesses it. Counsel for Aguirre–Parra notes that it is only necessary for the Court to review these requests if a conflict arises between the defense and the government. Memorandum of Law at 3. No such conflict having been brought to the Court's attention, the Court denies the motion.

## CONCLUSION

For the reasons stated above, defendants' motions are denied.

IT IS SO ORDERED.