## UNITED STATES

v.

**Gustavo AGUIRRE–PARRA, Carlos Rodriguez, a/k/a "Federico, or Fred, Ortega–Suarez," Orlando Gill, Fernando Salcedo–Castillo, a/k/a "Coco", and Herman Varela, Defendants.**

**No. 90 Cr. 533 (RPP).**

United States District Court,
S.D. New York.

May 22, 1991.

Otto Obermaier, U.S. Atty., S.D.N.Y., New York City by Robert W. Ray, Asst. U.S. Atty., for the Government.

Schulman & Laifer, Brooklyn, N.Y. by Barry Schulman, for defendant Gustavo Aguirre–Parra.

Ivan Fisher, New York City, for defendant Carlos Rodriguez.

Linda Frazier, New York City, for defendant Orlando Gill.

David Ely, New York City, for defendant Fernando Salcedo–Castillo.

Mario Malerba, Kew Gardens, N.Y., for defendant Herman Varela.

## OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

Defendant Gustavo Aguirre–Parra ("Aguirre–Parra") moves for the suppression of any evidence seized during and as a result of his arrest on August 2, 1990, on the ground that the search and seizure violated his constitutional rights, claiming there was no probable cause to arrest him, he did not consent to the agents' entry into his apartment and there were not exigent circumstances to justify entering or arresting him without a warrant. On the same grounds, he moves for dismissal of the charges against him. A hearing on the circumstances of the arrest was held on April 11, 1991 and April 19, 1991.

For the reasons stated below, defendant's motions are denied.

## BACKGROUND

The general factual background of this narcotics case is more fully set forth in this Court's prior Opinion and Order, dated April 18, 1991, familiarity with which is presumed. Opinion and Order, 90 Cr. 533 (RPP), 763 F.Supp. 1208 (S.D.N.Y. April 18, 1991). With regard to the subject of this hearing, defendant Aguirre–Parra has submitted to the Court an unsworn declaration in the form of an affidavit, which is accepted pursuant to 28 U.S.C. § 1746. Declaration of Gustavo Aguirre–Parra, May 20, 1991 ("Aguirre–Parra Hearing Declaration").[1] The facts surrounding the arrest of Aguirre–Parra, drawn from his Hearing Declaration, the sworn statements of Special Agent David Schwefel and Assistant Special Agent in Charge John Toal and the testimony of Special Agents Michael Grabowski and Edward Oberti at the hearing, are as follows.[2]

Aguirre–Parra's four co-defendants were arrested in the evening of August 1, 1990. Aguirre–Parra was arrested at about 2:00 a.m., August 2, 1990. All the defendants were arrested in connection with an investigation by Drug Enforcement Agency ("DEA") agents attached to DEA New York Field Division Group 32 ("Group 32"). Group 32 is one of five investigative groups in Division 30; ASAC Toal is the supervisor of Division 30. Agents in Group 32 were

---

1. Aguirre–Parra has also submitted to the Court an unsworn declaration in the form of an affidavit dated May 20, 1991, in which he states that he was stopped on a prior occasion, July 20, 1990, while in his car, by federal agents, who proceeded to accompany him to his home and search both his and his landlord's apartments. The defense argues that it should be considered in further support of the motion to suppress, suggesting that the alleged July 20 search was illegal and that evidence obtained during that search led to the arrest of Aguirre–Parra. While the Court accepts the unsworn declaration under 28 U.S.C. § 1746, there has been no affirmation of facts tending to support the claim that the alleged July 20, 1990 "search" in any way aided the August 2, 1990 arrest and search. The government represented to the Court at the above hearing that it had no knowledge of anything taken in a search on July 20, 1990 and consequently did not intend to submit any evidence seized during such a search. Tr. 2–4. Accordingly, the "search" on July 20, 1990 will not be discussed further. See Tr. 59–62.

2. "Tr." refers to the transcript of the hearing, which was held on two days, April 11, 1991 and April 19, 1991.

part of an ongoing investigation of a target using the name "Cobra." During that investigation, Gloria Woods, the Group Supervisor of Group 32, informed ASAC Toal that on May 11, 1990, one or more confidential informants met with "Cobra" in the vicinity of a "Toys–R–Us" store in Queens, New York. Affidavit of Assistant Special Agent in Charge ("ASAC") John Toal ("Toal Affidavit"), February 4, 1991, ¶ 2.

Special Agent David Schwefel stated in the sworn Complaint (based on personal knowledge and conversations with two confidential informants, who had proven to be reliable in the past, and with other agents) that "Cobra" met with the two confidential informants referred to as "C/I–1" and "C/I–2" and Rony Castillo on May 11, 1990, in the vicinity of a shopping center in Queens, at which time "Cobra" provided $95,000 in cash to cover expenses related to the transport of 496 kilograms of cocaine to the United States. That same day, in the vicinity of the New Orleans International Airport, Castillo gave to an undercover agent of the DEA a package containing approximately $65,000 in cash. On or about July 12, 1990, on the coast of Guatemala, Special Agent Schwefel and C/I–2 received a shipment of approximately 496 kilograms of cocaine from a fishing vessel which arrived from Colombia. Complaint of Special Agent David Schwefel (the "Complaint"), August 2, 1990, at 2, ¶¶ 1–3, attached as Exhibit E to the Government's Letter of December 12, 1990.

Prior to July, 1990, ASAC Toal was informed that confidential informants of Group 32 had described "Cobra" as a Colombian man with a moustache, who drove a late-model, grey Lincoln Continental Town Car. Toal Affidavit, *supra,* ¶ 2. During the month of July, 1990, in conjunction with the DEA office in New Orleans, confidential informants and agents of the DEA held numerous telephone discussions with "Cobra" and his agent, "Cheo," about the proposed sale of a portion of the 496 kilograms of cocaine shipped to the United States by associates of a drug cartel based in Cali, Colombia, for which "Alejandro" or "Alex" was a contact, as more fully described in this Court's prior Opinion and Order dated April 18, 1991. A key participant in those conversations was C/I–1, using the name "Barbas," who was present at the May 11, 1990 meeting with "Cobra." *See* Opinion and Order of April 18, 1991, at 1212.

On or about July 20, 1990, ASAC Toal found out that another DEA group was also investigating a target using the name "Cobra." Upon further inquiry by ASAC Toal, Special Agent Arthur Anderson, a member of the second DEA group, told ASAC Toal that a DEA confidential informant had met with "Cobra" on or about July 18, 1990, in the vicinity of 30th Avenue and 75th Street, Queens, New York, and that the informant had gone to "Cobra's" home at 25–16 72nd Street, East Elmhurst, New York, where "Cobra" gave the informant approximately $300,000. The informant also reported that "Cobra" drove a grey Lincoln Continental Town Car with New York livery plates and described "Cobra" as a Colombian man with a moustache. Toal Affidavit, *supra,* 3.[3] Special Agent Anderson also told ASAC Toal that on July 20, 1990, surveying DEA agents observed a grey Lincoln Continental Town Car with New York license plate number T53845C at 25–16 72nd Street and that the above New York license plate number was registered to Gustavo Aguirre, 25–16 72nd Street, East Elmhurst, New York. *Id.* After Special Agent Anderson gave this information to ASAC Toal on or about July 20, 1990, ASAC Toal passed it on to Gloria Woods, DEA Group 32 Supervisor, on or before July 31, 1990. *Id,* ¶ 4.

---

**3.** In a taped conversation with "Barbas" on July 20, 1990, "Cobra" appeared to have confirmed that he had driven a grey Lincoln Continental or Chrysler to the meeting between "Cobra," "Barbas" and the others on May 11, 1990, in response to a question by "Barbas." *See* Opinion and Order of April 18, 1991, at 1212. Although "Cobra" amended his answer in the same conversation, he indicated knowledge of the event in question and confirmed the presence of the grey car; thus the agents had reason to suspect that it was in fact "Cobra" who was present on May 11, 1990.

A record check during that time period revealed that Gustavo Aguirre was Gustavo Aguirre–Parra, who was a Colombian male previously arrested by the DEA on March 10, 1988. DEA files contained a 1988 arrest photograph of Aguirre–Parra and a personal history statement indicating that he was a taxi driver. Toal Affidavit, *supra*, ¶ 4. ASAC Toal states that upon information and belief, the same information was then provided to Special Agent Edward Oberti, the co-case agent for the instant investigation, and to Special Agent David Schwefel of the DEA's New Orleans Field Office. Toal Affidavit, *supra*, ¶ 5.

Aguirre–Parra's four co-defendants were arrested in the evening of August 1, 1990, by DEA agents attached to Group 32. Special Agent Grabowski and other agents transported the four to the DEA office in Manhattan and began processing them about 6:30–7:00 p.m. As a result, the DEA agents learned that one or more of the four persons arrested had rented a hotel room at the Royce Hotel at La Guardia Airport, Queens, New York. Special Agent Grabowski dispatched a team of agents to the Royce Hotel for further investigation. He and other agents went to the vicinity of 25–16 72nd Street, Queens, New York, Tr. 6–7, and arrived in the vicinity of 25–16 72nd Street later in the evening of August 1, 1990. Tr. 37. They surveyed the house at that address and observed the man later identified as Aguirre–Parra come out of the second-floor apartment, get into a grey Lincoln Continental Town Car parked outside and drive to a car service business in the vicinity of 81st Street and Northern Boulevard, where the man parked the car and apparently left it, although the agents did not observe where he went. The agents stayed there. Tr. 9–10.

Meanwhile, other agents took up the surveillance of 25–16 72nd Street. Later that evening, one of those agents, Special Agent Bullard, radioed Special Agent Grabowski to tell him that a person was leaving 25–16 72nd Street, from the apartment on the first floor. Special Agent Grabowski told him to follow that person's car, pull it over and question the person driving it. Special Agent Bullard radioed back some time later

that he had done so, he had spoken with the person, who lived in the first floor apartment of 25–16 72nd Street, and that man had told Special Agent Bullard that a Spanish man named "Gus" lived in the apartment on the second floor of 25–16 72nd Street and that "Gus'" wife and children were away. Tr. 10–11. Special Agent Bullard also gave Special Agent Grabowski a telephone number for the second floor apartment; Special Agent Grabowski called the number between 1:30 and 2:00 a.m. on August 2, 1990, and hung up when a "Spanish-speaking male" answered. Tr. 11. Special Agent Grabowski then told his fellow agents that the team was going to proceed back to 25–16 72nd Street to attempt to identify the person who had answered the phone at the second floor apartment at that address. Tr. 11–12.

At about 2:00 a.m. on August 2, 1990, the DEA agents went to 25–16 72nd Street and approached the second floor apartment. Some of the agents stayed at the foot of the stairs leading to the second floor apartment and some were on the landing where the door was. Tr. 41–42. Special Agent Grabowski knocked on the door. After a minute or two, Gustavo Aguirre–Parra called from within, "I'm coming, I'm coming." Special Agent Grabowski could see lights go on in the dark apartment, then Aguirre–Parra came to the door and opened it. Aguirre–Parra was dressed as if he had been in bed when the agents knocked. Tr. 12–13, 43–44. Special Agent Grabowski had his gun drawn but did not display it to Aguirre–Parra, keeping it by the side of his leg. Tr. 43. Special Agent Oberti testified that he was standing a number of steps down from the second-floor doorway, at the sidewalk level, while Special Agent Grabowski was standing directly in front of the door. Tr. 70–71, 76. All the agents had their guns drawn. *Id.* As Special Agent Oberti saw the door opening, he turned his back to the door and the rest of the agents, in order to cover any possible assault from the agents' rear. Tr. 74. Special Agent Oberti also testified that he was close enough to hear if any voices

had been raised and that he did not hear any voices raised. Tr. 97–98.

Special Agent Grabowski testified that when Aguirre–Parra opened the door, he told him he and the other agents were "police officers" and asked if they could "come in and ask him a few questions." Tr. 12–13. Special Agent Grabowski testified that Aguirre–Parra said, "Come in," and stepped back, motioning for Special Agent Grabowski to come in. Special Agent Grabowski also testified that he asked if Aguirre–Parra minded if the agents looked around and Aguirre–Parra said "No." Tr. 12–13.

Upon entering, Special Agent Grabowski asked if Aguirre–Parra would sit down at the kitchen table with him and the defendant did so. While the two of them sat down, the other agents, at Special Agent Grabowski's direction, looked in the apartment for any identifying documents. Tr. 13. Special Agent Grabowski asked Aguirre–Parra what he did for a living and Aguirre–Parra answered that he was a livery driver. Aguirre–Parra stated the police had recently been to the apartment and asked Special Agent Grabowski why the agents were there again. Tr. 40–41. About that time, Special Agent Bullard returned to the kitchen with a Colombian passport and an employment card. At that point, Special Agent Grabowski determined from a photograph on the passport or the employment card that the person sitting at the table with him was in fact Gustavo Aguirre–Parra, whereupon Special Agent Grabowski arrested him and read him his rights. Tr. 13. Aguirre–Parra was then handcuffed. *Id.* The agents took the passport and other pieces of identification, including three driver's licenses (one expired, one current and one from New Jersey), an expired temporary resident card and an expired employment authorization card, as well as rent receipts, an address book, a note pad, a phone bill, a bank deposit slip, a red cardholder and a card. Tr. 45–48.

At the hearing, defense counsel relied on a copy of a DEA Report of Investigation (the "Report") which summarized the events of August 1 and 2, 1990 and is dated August 4, 1990. Tr. 24. The report, marked as Government Exhibit 3501A, was prepared by Special Agent Edward Oberti. Tr. 67. As to Aguirre–Parra, the report reads as follows:

7. At approximately 2:00 AM, on August 2, 1990, Agent's from Group 32 proceed to the address, 96 16 72nd Street Queens, NY [sic]. While at that address, agents knocked and announced themselves as Police Officers at the door at which time Gustaro [sic] AGUIRRE opened it. At that moment, AGUIRRE was placed under arrest without incident. Following his arrest, AGUIRRE was handcuffed, searched and read his Constitutional Rights which he acknowledged he understood by S/A Grabowski, as witnessed by S/A Oberti. Upon his arrest, GUIRRE [sic] was transported to the Metropolitan Correctional Center (MCC) for processing and lodging.

Government Exhibit 3501A, ¶ 7. On April 24, 1991, after the hearing, the government also produced, at defense counsel's request, a copy of a cable from the DEA's New Orleans office to the New York office, which had been mentioned by Special Agent Grabowski during his testimony as part of the information about "Cobra" which he had prior to the August 2, 1990 arrest. Tr. 17; Government Exhibit 3501E.

## DISCUSSION

The government states that all evidence seized at 25–16 72nd Street on August 2, 1990, was taken after the consent by Aguirre–Parra to the agents' entry and search of his apartment at 25–16 72nd Street and that the warrantless arrest of Aguirre–Parra inside the apartment and the search of the apartment were lawful because the entry and search were consensual and the arrest was supported by probable cause and exigent circumstances. Defense counsel argues a) there was no probable cause to arrest Aguirre–Parra, b) no exigent circumstances existed to justify a warrantless arrest and therefore any evidence seized in the course of the arrest or as a result thereof is tainted and must be suppressed, and c) the entry and search took place without a "knowing and volun-

tary consent," Defendant's Letter of May 3, 1991, at 3.

## I. Probable Cause

■ The Toal Affidavit and the testimony of Special Agents Grabowski and Oberti show that there was probable cause to arrest Aguirre–Parra. Group 32's investigations had turned up evidence of the involvement, in an ongoing conspiracy to distribute cocaine, of a Spanish-speaking man using the unusual name "Cobra," whose telephone conversations with DEA confidential informants had been taped by the DEA and who appeared to be the man who had driven a grey Lincoln Continental to a meeting with DEA informants at a Toys–R–Us parking lot in Queens, on May 11, 1990. The DEA had taped "Cobra" in phone conversations with a DEA confidential informant in July, 1990, discussing a large drug transaction in progress, involving a portion of 496 kilograms of cocaine shipped to the United States and hundreds of thousands of dollars in payment for it. *See* Opinion and Order, 763 F.Supp. 1208 (S.D.N.Y. 1991).

On or about July 20, 1990, Group 32 had received information that another DEA group also had evidence that a Colombian man with a moustache, using the name "Cobra," who lived at 25–16 72nd Street, East Elmhurst, Queens, New York and drove a grey Lincoln Continental Town Car with New York plate number T53845C, had transferred $300,000 to a DEA confidential informant reporting to another DEA group. The DEA also discovered that the same car was registered to Gustavo Aguirre, 25–16 72nd Street, East Elmhurst, New York, and that their files contained an arrest photo of him with a moustache and a beard. Exhibit D, Government's Letter of January 22, 1991. Putting the two sets of information together, it is apparent that between July 20, 1990 and July 31, 1990, DEA agents knew that "Cobra," whom they had taped in discussions related to the transportation from Colombia of, and a proposed transaction involving the sale of, hundreds of kilograms of cocaine, was in all probability Gustavo Aguirre or

Aguirre–Parra and that he resided at 25–16 72nd Street, East Elmhurst, New York.

Upon arresting Aguirre–Parra's four co-defendants as they participated in a proposed sale of the cocaine, DEA agents proceeded to the vicinity of 25–16 72nd Street, where they observed Aguirre–Parra as set forth above. The agents then proceeded to that residence, determined that the suspect lived in the second floor apartment, determined that a Spanish-speaking man was in that apartment and, upon entry, determined that man to be, in fact, Gustavo Aguirre–Parra and arrested him. In view of all the surrounding circumstances, the agents had probable cause to believe that "Cobra" was a leader in the drug distribution conspiracy they were investigating and that Aguirre–Parra was "Cobra." Accordingly, the DEA had probable cause to arrest Aguirre–Parra.

## II. Exigent Circumstances

■ Aguirre–Parra's counsel argues that the warrantless arrest in the apartment was unlawful, that as a result the evidence seized upon arrest or as a result of the arrest is tainted by an illegal arrest, and that accordingly all such evidence must be suppressed. The government asserts that Aguirre–Parra consented voluntarily to entry and that even if the record did not show voluntary consent, the circumstances surrounding the arrest bring it within the exigent circumstances exception to the requirement of a warrant, rendering the warrantless arrest lawful. *See Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *United States v. MacDonald*, 916 F.2d 766, 769–70 (2d Cir.1990) (in banc). In determining the presence of "exigent circumstances" justifying a warrantless arrest, a court in this circuit will consider the *"Dorman* factors," summarized by the Second Circuit Court of Appeals in *MacDonald, supra,* 916 F.2d at 769–70 (citing *Dorman v. United States,* 435 F.2d 385, 391–93 (D.C.Cir.1970)), *cert. denied,* —— U.S. ——, 111 S.Ct. 1071, 112 L.Ed.2d 1177 (1991). Among those factors are "the gravity or violent nature of the offense," " 'a clear showing of probable cause to believe that the suspect committed

the crime,' " " 'strong reason to believe the suspect is in the premises,' " " 'likelihood that the suspect will escape if not swiftly apprehended,' " and whether the entry of the premises occurred under "peaceful circumstances." *MacDonald, supra,* 916 F.2d at 769–70.

The gravity of the offense and its potential for violence are inherent generally in the nature of cocaine dealing in this city and specifically in the large amounts of drugs and money involved in this case. The agents had probable cause to believe that Aguirre–Parra, living at 25–16 72nd Street, Queens, New York, was the suspect who had committed the crime they were investigating, as discussed *supra.* Special Agent Grabowski had reason to believe Aguirre–Parra was "Cobra" and was on the premises of 25–16 72nd Street from the facts in his testimony, discussed *supra.*

As to likelihood of escape, the Court takes judicial notice of the fact that a foreign national with a foreign passport may pose a substantial risk of flight, if he or she is about to be arrested for a serious crime. In this case, DEA agents were confronted with a person whose tape-recorded conversations showed he was in contact with the Colombian source of 496 kilograms of cocaine, interested in the distribution of that cocaine in the United States, and knowledgeable about at least the proposed transaction with at least one of the co-conspirators arrested that night. *See* Opinion and Order dated April 18, 1991, 763 F.Supp. 1208. He was known to be well-supplied with cash and DEA agents ascertained that his family was away from home, their whereabouts unknown.

Aguirre–Parra had already succeeded in eluding the observation of the DEA agents once that night. DEA agents had revealed a law enforcement presence and interest in Aguirre–Parra that evening to Aguirre–Parra's downstairs neighbor, when they questioned him about Aguirre–Parra. In light of the strong likelihood of there being other conspirators who would know or learn of the arrests of the co-defendants, and in light of his financial transactions, Aguirre–Parra could well have fled the country if not swiftly apprehended. *See MacDonald, supra,* 916 F.2d at 770 (danger of escape aggravated by additional time required for, and impracticability of, getting a warrant at late hour).

By interviewing the neighbor, the agents confirmed that the occupant of the second-floor apartment at 25–16 72nd Street was a Spanish-speaking man called "Gus" and, by a telephone call, they confirmed that the occupant was on the premises. Finally, the agents ascertained, prior to approaching Aguirre–Parra's apartment, that his family was away, thus reducing any danger that the peaceful circumstances of an entry would be compromised, and two agents testified on April 11, 1991 and April 19, 1991, to the peaceful nature of the entry and arrest. Their testimony is uncontradicted. Weighing all the *Dorman* factors under *MacDonald, supra,* the warrantless arrest of Aguirre–Parra was lawful.

### III. Consent to Entry and Search

■ The evil sought to be prevented by the warrant requirement of the Fourth Amendment is unjustified government intrusion into the privacy of the home. *See MacDonald, supra,* 916 F.2d at 769, and cases cited therein. The warrant requirement "applies equally to seizures of persons and to seizures of property." *Payton v. New York, supra,* 445 U.S. at 586, 100 S.Ct. at 1380. In general, it is prohibited for government agents to seize a person in the home or search the premises without a warrant, although certain narrow exceptions apply such as when exigent circumstances justify the lack of a warrant, as discussed *supra,* or when entry is consensual. "The prohibition does not apply, however, to situations in which voluntary consent has been obtained, either from the individual whose property is searched … or from a third party who possessed common authority over the premises." *Illinois v. Rodriguez,* —— U.S. ——, ——, 110 S.Ct. 2793, 2797, 111 L.Ed.2d 148 (1990) (citations omitted).

The government asserts that the DEA agents asked for and received Aguirre–Parra's voluntary consent to enter the apart-

ment and look around. Aguirre–Parra states in his declaration that he never gave any consent for the agents to enter his apartment on August 2, 1990. Aguirre–Parra Hearing Declaration. His counsel argues that Aguirre–Parra may have consented but did so involuntarily, implying that involuntariness is inherent in the circumstance of several armed DEA agents standing at Aguirre–Parra's door at 2 a.m. and speaking to him in English. Defense counsel also suggests that Aguirre–Parra was under arrest as soon as he opened the door, implying that even if Aguirre–Parra did consent to entry or search, such consent was involuntary in that it was given after he had been arrested.

As to the suggestion by counsel that the agents should have spoken Spanish or consent should have been obtained in Spanish, Aguirre–Parra has not stated, and did not state at the time, that he did not understand the agents. There is no evidence that Aguirre–Parra, a livery driver, does not understand English.

As to possible coercion, although the hour of 2 a.m. and the presence of several agents could, in theory, intimidate one who was visited by law enforcement personnel under those circumstances, in this case there is no showing that Aguirre–Parra was frightened or intimidated when the agents came to his door, or that they displayed their weapons to him, or that he consented involuntarily or under any pressure, or that he was misled by the agents. The uncontradicted testimony of Special Agent Grabowski shows that Aguirre–Parra asked questions freely and had a short conversation about his occupation with Special Agent Grabowski while sitting at the kitchen table. Tr. 40–41. Special Agent Oberti testified that no voices were raised and that neither he himself nor Special Agent Grabowski had their guns drawn while in the kitchen. Tr. 97–98. The record is devoid of evidence to show that Aguirre–Parra was coerced in any way, directly or indirectly, into consenting to entry or search. On the contrary, the record shows that the agents maintained a proper balance between assuring their own and the public's safety in a situation with a high likelihood of danger and avoiding any coercion of Aguirre–Parra. His statement that he did not consent at all to entry is contradicted by the testimony of Special Agent Grabowski and is not further argued by his counsel.

Aguirre–Parra's counsel relies on the DEA Report of Investigation (the "Report"), labelled as Government Exhibit 3501A, to suggest that Aguirre–Parra was under arrest as soon as he opened the door. The Report, however, is by co-case agent Special Agent Oberti who testified that he was not in a position to observe when the arrest took place. The Report does not purport to be a detailed account of the events which took place but is of a summary nature.

Looking at the "totality of all the surrounding circumstances," *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973), the weight of the evidence supports a finding that Aguirre–Parra voluntarily consented to the entry and search. The agents had no obligation to tell him he had a right to refuse. *Id.* at 230–32, 93 S.Ct. at 2049–50. The circumstances and the testimony show that Aguirre–Parra was not under arrest until after the agents were able to confirm that the identity of the man who answered the door was Gustavo Aguirre–Parra, who they had cause to believe was "Cobra." *See* Tr. 13, 26–27, and discussion of probable cause, *supra.* The circumstances prior or subsequent to the arrest at the kitchen table do not resemble the overwhelming show of force and taking into custody in *United States v. Maez*, 872 F.2d 1444, 1450–51, 1454–57 (10th Cir.1989), which were held to have tainted the consents to search.

In short, the record shows that there was probable cause to arrest Aguirre–Parra, that exigent circumstances existed which justified the warrantless arrest and that Aguirre–Parra voluntarily consented to the agents' entry and search of his apartment at 25–16 72nd Street, East Elmhurst, New York, on August 2, 1990. Aguirre–Parra's motion to dismiss the charges is denied and his motion to suppress the evidence taken

from his apartment on August 2, 1990, as well as any evidence seized as a result of that search, or resulting statements or identifications, is also denied.

## CONCLUSION

For the reasons stated above, defendant's motions to suppress evidence and to dismiss the charges against him are denied. Parties are ordered to appear for a conference on May 24, 1991, at 9 a.m., in Courtroom 302, United States Courthouse, Foley Square, New York, New York.

IT IS SO ORDERED.